**TC X, INC., and TC 126, Inc., Plaintiffs,**

v.

**COMMONWEALTH LAND TITLE INSURANCE COMPANY, Defendant.**

**C.A. No. 0:93–640–17.**

United States District Court, D. South Carolina, Rock Hill Division.

Feb. 21, 1995.

Braxton Craig Collins, Mitchell Myron Willoughby, Willoughby Law Firm, Columbia, South Carolina, Charles T. Speth, II, Jeffrey Morcom Nelson, Haynsworth, Baldwin, Johnson & Greaves, P.A., Columbia, S.C., for plaintiffs.

Michael W. Tighe, Suzanne Hawkins, Louis Lang, Callison, Tighe, Robinson & Hawkins, Columbia, S.C., for defendant.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This action involves a dispute over the proper interpretation of a title insurance policy issued by the Defendant, Commonwealth Land Title Insurance Company (Commonwealth), to Plaintiff TC X, Inc. (TC X).

The court bifurcated discovery in this matter, allowing discovery on the issue of liability to proceed and holding in abeyance discovery on the issue of damages.

The Plaintiffs, TC X and TC 126, Inc. (TC 126), have moved for summary judgment on the issue of liability as to the first cause of action in the complaint, which alleges that Commonwealth breached the title policy. Commonwealth has moved for summary judgment on the issue of liability on the Plaintiffs' first cause of action, as well as on the Plaintiffs' second and third causes of action, which allege a bad-faith breach of the title policy and a violation of the South Carolina Unfair Trade Practices Act (UTPA), S.C.Code Ann. § 39–5–10 *et seq.* (Law.Co-op.1985), respectively. The court heard oral argument on these motions on July 11, 1994, at which time the court took the motions under advisement. Because of the complexity of the issues involved, the court scheduled reargument of the motions, which was heard on October 25, 1994. For the reasons set forth below, Commonwealth's motion is granted, the Plaintiffs' motion denied, and the complaint is dismissed with prejudice.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

■ The moving party has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Viewed in the light most favorable to the Plaintiffs, the facts are as follows:

On November 30, 1988, TC X purchased from TC 126 approximately 377 acres of mostly undeveloped land located in Tega Cay, South Carolina. TC X was a new corporation, which had been formed for the purpose of financing the acquisition and development of this property (Title X property). TC X obtained financing for the acquisition of the Title X property under a program administered by the Department of Housing and Urban Development (HUD) pursuant to Title X of the National Housing Act, 12 U.S.C. §§ 1749aa–1749*ll* (1988) (repealed 1989).

The Title X program gave HUD discretionary authority to insure mortgages for land purchase and residential development in connection with new subdivisions and new communities. Under the Title X program, improvements that were to be installed by the developer and financed with the mortgage proceeds were to include, water and sewage systems, roads, streets, curbs, gutters, sidewalks, storm drains, and the like.

54 Fed.Reg. 33,039 (Aug. 11, 1989). Title X projects were to be designed for residential use, although a proportional amount of related nonresidential use was permitted. *Id.*

When TC X purchased the Title X property, it was subject to the claims of the Catawba Indian Tribe of South Carolina set out in the case entitled *Catawba Indian Tribe of South Carolina, a/k/a The Catawba Nation of South Carolina v. State of South Carolina, et al.*, C/A No. 80–2050–6.[1]

In conjunction with TC X's acquisition of the Title X property, Commonwealth provided a lender's title insurance policy, which was satisfactory to HUD, and an owner's policy, each in the amount of $8.4 million.

The language in dispute in this case is contained in Paragraph 9 of Schedule B to the owner's title policy,[2] which reads as follows:

> This policy insures against loss or damage which the Insured may sustain by reason of any right or claim of title which has been or may be asserted, of record or not, by or on behalf of any Indian or Indian tribe arising out of any treaty or any other transfer of land based on the Indian Non–Intercourse Act of 1790 or any similar state or federal law including any matter raised by the pending lawsuit filed in the United States District Court for the District of South Carolina bearing Civil No. 80–2050–6, entitled Catawba Indian Tribe of South Carolina, also known as the Catawba Nation of South Carolina v. State of South Carolina, et al. This policy includes insurance against loss [or] damage by reason of unmarketability of title (as hereinafter defined) on account of said defect. With respect to said defect the offer of any title insurance company licensed to transact business in the State of South Carolina, including this company, to insure at its regular rates the title to the land herein described in the manner herein set forth above shall be conclusive evidence of

---

**1.** At the time of the closing on the Title X property, the District Court for the District of South Carolina had granted the *Catawba Indian Tribe* defendants summary judgment, and the case was on appeal to the United States Court of Appeals for the Fourth Circuit.

**2.** The lender's policy contains an identical exception.

the marketability of the title hereby insured. The company agrees that upon request of any mortgagee or vendee of the insured, or the mortgagee of such vendee, to issue its policy containing the same affirmative coverage set forth above, but subject to the same condition.

Paragraph 9 provided, among other things, a limited form of marketability of title coverage for the insured. It did so by defining marketability of title as insurability of title. If title to the Title X property could be insured by a title insurance company, then that title was "marketable" regardless of the pendency of the Catawba Indian claim.[3]

Paragraph 9 was not part of the preprinted portion of the title policy, nor was it standard Commonwealth language. Further, there is no evidence that Paragraph 9 or similar language had been used previously by Commonwealth. In fact, the evidence indicates that Commonwealth proposed two entirely different exceptions dealing with the Catawba Indian claim, both of which were rejected by HUD.

The exception that became Paragraph 9 was proposed by and came from the office of Arvin Rosen, who was one of several attorneys representing TC X in the loan transaction. On November 17, 1988, Mr. Rosen's office telecopied the exception to the office of James Blakely, an attorney from the South Carolina law firm of Nelson Mullins Riley & Scarborough, who acted as local counsel for TC X. The next day, November 18, 1988, Mr. Blakely telecopied the exception he had received from Mr. Rosen's office to Commonwealth's Atlanta, Georgia office. On that same date, the exception was approved for inclusion in the lender's policy by Annette Gamble of Commonwealth, and Dennis Hoover, an attorney in Mr. Rosen's office, telecopied to Mr. Blakely TC X's request that the exception be included in the owner's policy.

On November 30, 1988, R & V Title Agency, on behalf of Commonwealth, issued to TC X the title policy, which contained Paragraph 9.

The dispute between the parties over the proper interpretation of Paragraph 9 arose as a result of a proposal to build a $50 million conference center on a portion of Section 20 of the Title X property. The conference center concept arose after the Title X property was acquired by TC X, and after the title policy was issued. As a result of discussions between TC 126 and Shinn–Bodycott Development Company ("Shinn–Bodycott"), TC 126 and Shinn–Bodycott formed a joint venture on August 25, 1989, known as Conference Center Associates Joint Venture ("Conference Center Associates"), to develop and build the conference center. The written joint venture agreement between the parties provided that TC 126 was to acquire Section 20 from TC X and then convey Section 20 to Conference Center Associates.

In accordance with its development responsibilities under the joint venture agreement, Shinn–Bodycott retained the services of Gary Swindell, an attorney with the North Carolina firm of Moore & Van Allen. It was Mr. Swindell's responsibility to obtain sufficient title insurance to attract a lender for the conference center project. Mr. Swindell approached Commonwealth and, on behalf of Conference Center Associates, requested a title insurance policy in the amount of $50 million, the estimated cost of development and construction for the conference center. This request was made after the Fourth Circuit had reversed the District Court and had remanded the Catawba Indian case to the District Court for trial. *Catawba Indian Tribe v. South Carolina*, 865 F.2d 1444 (4th Cir.) (argued Apr. 6, 1988, decided Jan. 23, 1989), *cert. denied*, 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989).

Commonwealth declined to issue a $50 million title insurance policy, but did issue a commitment to Conference Center Associates for a title policy in the amount of $8.4 million. This commitment contained the same exception that was contained in Paragraph 9 of Subsection B of the title policy. Mr. Swindell did amass commitments from other title insurance companies amounting to

---

3. For example, if a prospective purchaser did not want title insurance, and rejected the title because of the Indian claim, the insured would then have no marketability claim under its policy.

more than $50 million, all of which included some form of affirmative insurance over the Catawba Indian claim in the event of a divestiture of title. However, Commonwealth's $8.4 million commitment was the only commitment that contained limited marketability coverage over the Catawba Indian claim.

The Plaintiffs contend that Conference Center Associates was unable to develop the conference center because of Commonwealth's refusal to issue the $50 million commitment. Commonwealth argues that the title policy does not obligate it to issue any future policy in an amount in excess of the face amount of the title policy. Commonwealth also asserts that TC 126 cannot establish any claim against Commonwealth based upon its refusal to issue the $50 million policy to Conference Center Associates.

■ Federal jurisdiction in this case is based upon the diversity of citizenship between the Plaintiffs and Commonwealth. Accordingly, the court must apply South Carolina substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ In applying state law in diversity cases, a federal court must apply the law that it conscientiously believes would be applied in the state court system. In deciding how the courts of South Carolina would rule, this court is authorized to consider "all available legal sources, including restatements of the law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and the 'majority rule.' " 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4507, at 100–03.

■ The complaint alleges that "[i]n order to obtain financing for the project, Schinn–Bodycott [sic] and T.C. 126 requested that Commonwealth issue" the $50 million policy. In its second amended answer, Commonwealth asserts that the complaint fails to state a claim against it and that TC 126 is not the real party in interest. Since TC 126 is not a party to the insurance contract, the rights of TC 126 are dependent upon the

rights of a third-party beneficiary to enforce the terms of a contract. In other words, TC 126 can have no claim against Commonwealth unless it is a third-party beneficiary of the title policy or is entitled to assert the rights of a third-party beneficiary of the policy.[4]

■ To qualify as a third-party beneficiary under a contract, a third party must show "that the intent of the contracting parties was to confer a direct and substantial benefit on the third party. In the absence of a clear intent to benefit the third person, he cannot sue on the contract." *United States v. Chester Heights Assocs.,* 406 F.Supp. 600, 604 n. 2 (D.S.C.1975); *see also* 17A Am.Jur.2d *Contracts* § 440, at 463–64 ("As a general proposition, the determining factor as to the rights of a third-party beneficiary is the intention of the parties who actually made the contract.... Absent intent to benefit [the] third person, such third person is merely an incidental beneficiary with no right to enforce the contract.").

Because TC 126 is not mentioned in the title policy, its rights, if any, must be derived from Paragraph 9. The only language in Paragraph 9 that could possibly establish the right of a third party is the last sentence, which reads as follows: "The company agrees that upon request of any mortgagee or vendee of the insured, or the mortgagee of such vendee, to issue its policy containing the same affirmative coverage set forth above, but subject to the same condition."

This language occurs within a provision designed to guarantee the insured that his property is marketable, even though subject to the claim of the Catawba Indian Tribe. The policy does this by equating marketability with insurability. At the time this policy was issued, the joint venture had not been formed, and there is no evidence that anyone connected with Commonwealth was aware of the conference center project. The court concludes that Paragraph 9 was designed for the sole benefit of the insured named in the policy, and that any subsequent vendee or

---

**4.** In no reported case cited by either party, or discovered by the court, has a non-insured been found to be a third-party beneficiary of a title insurance policy.

mortgagee was, at best, an incidental beneficiary of the provision.

Even if the court were to conclude that TC 126 was an intended third-party beneficiary under the title policy, the court must nevertheless conclude that Commonwealth had no obligation to issue the requested $50 million policy.

■ "Under South Carolina law the construction and interpretation of an insurance policy should be determined as a matter of law by the court." *Allstate Ins. Co. v. Best,* 728 F.Supp. 1263, 1266 (D.S.C.1990) (citing *Hann v. Carolina Cas. Ins. Co.,* 252 S.C. 518, 167 S.E.2d 420, 423 (1969)). All contracts must be construed as a whole, and it is improper to construe a contract by focusing on one particular section of the contract without reference to other sections. *Sloan v. Colonial Life & Accident Ins. Co.,* 222 S.C. 248, 72 S.E.2d 446 (1952).

■ Nothing in the policy expressly obligates Commonwealth to issue a title policy in excess of the amount of insurance provided by the title policy—$8,413,700. Schedule A of the title policy specifically states that the "amount of insurance" is $8,413,700. Further, several paragraphs of the title policy expressly limit Commonwealth's liability to the amount of insurance. Paragraph 6, "Conditions and Stipulations," provides as follows:

A. The liability of the Company under this policy shall in no case exceed the least of:

(i) The actual loss of the insured claimant; or

(ii) The amount of insurance stated in Schedule A.

This paragraph explicitly provides that in no event shall Commonwealth's liability, *i.e.,* Commonwealth's obligation under the policy, exceed $8.4 million. The provision is not confined to claims under the policy, but also the obligations of Commonwealth under Paragraph 9 as well. Thus, the plain language of the policy provides that Commonwealth's obligations for policies issued to subsequent vendees or mortgagees of TC X

cannot exceed the amount of insurance stated in Schedule A—$8.4 million.

■ The court's conclusion that the title policy, when read as a whole, did not obligate Commonwealth to issue the $50 million policy is consistent with the court's earlier determination that Paragraph 9 is nothing more than a limited form of marketability coverage. The insuring clause of the title policy provides insurance against, among other things, "unmarketability of title." Ordinarily, marketability means that a title is free from encumbrances and any reasonable doubt as to its validity. A marketable title is a title which a reasonable purchaser, well informed as to the facts and their legal significance, is ready and willing to accept. *Gibbs v. G.K.H., Inc.,* 311 S.C. 103, 427 S.E.2d 701, 702 (Ct.App.1993); *see also Sanders v. Coastal Capital Ventures, Inc.,* 296 S.C. 132, 370 S.E.2d 903 (Ct.App.1988), *cert. denied,* 298 S.C. 204, 379 S.E.2d 133 (1989).

Given the pending status of the Catawba Indian litigation at the time the title policy was issued, title to the Title X property was unmarketable. Thus, some type of affirmative marketability coverage over the Catawba Indian claim was necessary for the Title X transaction to close. Paragraph 9 provided a limited form of marketability coverage by equating marketability with insurability. If any title insurance company licensed to transact business South Carolina had been willing to insure title to the property (such insurance including the limited marketability coverage provided by Paragraph 9), then title to the property would have been considered marketable. This special definition of marketability is far narrower than the common-law definition of marketability. A title could clearly be insurable, but not marketable in the common-law sense. Paragraph 9 does not provide an avenue for a vendee or mortgagee of the insured to demand an additional policy in an unlimited amount from the insurer, nor does it obligate the insurer to issue such a policy.

Accordingly, reading the policy as a whole, the court concludes that Commonwealth was

under no obligation to issue the requested $50 million policy.[5]

Commonwealth is also entitled to summary judgment on the Plaintiffs' claim for bad-faith breach of the title insurance policy. Because the court has determined that there was no breach of the title policy, by definition no action lies for bad-faith breach of the policy.

■ Finally, the Defendant is entitled to summary judgment on the Plaintiffs' claim under the South Carolina UTPA. The Plaintiffs have alleged that Commonwealth's refusal to issue additional title insurance with the same coverage as that contained in the title policy constituted an unfair or deceptive act or practice in the conduct of trade or commerce in violation of UTPA. The court concludes that the Defendant committed no violation of the UTPA.

■ Section 39–5–20 of the UTPA makes it unlawful to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. Section 39–5–140 permits actions by private parties who have suffered an ascertainable loss as a result of a violation of the UTPA. In order for the Plaintiffs to recover under the UTPA, each Plaintiff must show the following: (1) the actions of Commonwealth were unfair or deceptive as to them; (2) the actions complained of were made by Commonwealth in the conduct of trade or commerce; (3) each Plaintiff suffered an ascertainable loss as a result of Commonwealth's actions; (4) the public interest was affected; and (5) there is potential for repetition. *Young v. Century Lincoln–Mercury, Inc.*, 302 S.C. 320, 396 S.E.2d 105 (Ct.App.1989), *aff'd in part, rev'd in part*, 309 S.C. 263, 422 S.E.2d 103 (1992); *Baker v. Chavis*, 306 S.C. 203, 410 S.E.2d 600 (Ct.App. 1991); *Noack Enters., Inc. v. Country Corner Interiors, Inc.*, 290 S.C. 475, 351 S.E.2d 347 (Ct.App.1986), *cert. dismissed*, 294 S.C. 235, 363 S.E.2d 688 (1987).

■ Courts have defined "unfair" as used in the UTPA as offensive to public policy, or as immoral, unethical, or oppressive. *Young v. Century Lincoln–Mercury, Inc., supra.* A practice is deceptive if it has a tendency to deceive. *State ex rel. McLeod v. Brown*, 278 S.C. 281, 294 S.E.2d 781 (1982).

Commonwealth's actions in this matter cannot be described as offensive to public policy or as immoral, unethical, oppressive or deceptive. Paragraph 9 was not created by Commonwealth. In addition, there is no evidence that prior to closing Commonwealth ever gave an interpretation to the Plaintiffs of the Paragraph 9, nor was Commonwealth ever asked by Plaintiffs prior to closing to give an interpretation of the exception. Conference Center Associates' request for a $50 million policy from Commonwealth was the first time Commonwealth had been asked its opinion regarding its obligations under the title policy. There is no evidence that Commonwealth deceived TC X or anyone else regarding its interpretation of the policy.

Further, Plaintiffs have offered no proof that Commonwealth has engaged in any deceptive practice. There is no allegation, nor is there any evidence, that Commonwealth represented to either Plaintiff that it would issue policies in amounts greater than $8,417,000. At best, Plaintiffs' complaint raises a dispute between private parties as to the proper interpretation of Commonwealth's obligations under the title policy.

Plaintiffs have, therefore, failed to produce any evidence of unfairness or deception. Fed.R.Civ.P. 56(c) requires the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. As the U.S. Supreme Court pointed out in *Celotex, supra:*

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, ... Rule 56(e) ... requires the nonmoving party to go beyond the pleadings

---

**5.** Because the court concludes that TC 126 is not a third-party beneficiary and, in the alternative, that the policy did not obligate Commonwealth to issue subsequent policies in excess of $8.4 million, the court need not reach the Defendant's other arguments in support of its motion for summary judgment as to the Plaintiffs' breach of contract claim. Accordingly, the court offers no opinion as to the merits of those arguments. The court notes, however, that many of the Defendant's additional arguments challenge proximate cause or damages, which issues were postponed under the court's bifurcation order until the second phase of this lawsuit.

and ... designate "specific facts showing that there is a genuine issue for trial."

. . . .

[T]he burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case.

477 U.S. at 324–25, 106 S.Ct. at 2553–54.

Because the Plaintiffs cannot satisfy an essential element of their claim under the UTPA, that claim must fail.

## CONCLUSION

For the reasons set forth above, Commonwealth's motion for summary judgment is granted, the plaintiffs' motion for summary judgment is denied and the complaint is dismissed with prejudice.

IT IS SO ORDERED.