529 S.E.2d 28

**Karen J. WILLIAMS, Respondent,**

v.

**James R. RIEDMAN, Riedman Corporation, and Rhoda Ryan,**

**of whom Riedman Corporation, is Appellant.**

No. 3127.

Court of Appeals of South Carolina.

Heard Sept. 10, 1999.

Decided Feb. 28, 2000.

Rehearing Denied May 13, 2000.

254

Cherie W. Blackburn, Steven M. Wynkoop and Elizabeth M. McMillan, all of Nelson, Mullins, Riley & Scarborough, of Charleston, for appellant.

A. Arthur Rosenblum and Benjamin Goldberg, both of Charleston, for respondent.

CONNOR, Judge:

Karen J. Williams claimed an employee manual changed her status as an at-will employee. She sued the Riedman Corporation for breach of contract, breach of the covenant of good

faith and fair dealing, unfair trade practices, conspiracy, fraud, and negligent misrepresentation. She also filed claims of conspiracy, fraud, and negligent misrepresentation against James R. Riedman. Additionally, Williams sued Rhoda Ryan, Riedman's branch manager, for conspiracy and tortious interference with a contract. She sought a declaratory judgment concerning the restrictive covenants in Riedman's Non–Piracy Agreement. Riedman answered, denying the employee manual created a contract with Williams, and counterclaimed for breach of the Non–Piracy Agreement, tortious interference with prospective contractual relations, breach of contract accompanied by fraudulent act, and violation of the Uniform Trade Secrets Act. The jury found for Williams on the breach of contract and breach of covenant of good faith and fair dealing causes of action. It found for the defendants on Williams's claims for negligent misrepresentation, fraud, and conspiracy, but found for Williams on Riedman's counterclaim. Riedman appeals. We affirm in part, reverse in part, and remand.

## FACTS

Beginning in 1982, Williams worked for the Kay Insurance Agency. She held several different positions there, including producer, sales representative, office manager, and vice president. While employed with Kay, Williams acquired and serviced 148 accounts. In March 1994, Riedman purchased Kay. Riedman operates insurance agencies in fourteen states, including South Carolina, where it has four offices.

Riedman hired Williams to work in its North Charleston office. As a condition of employment, Riedman required Williams to sign a Non–Piracy Agreement, which contained a restrictive covenant and a covenant not to disclose confidential information about clients. Williams was given an employee manual at the outset of her employment.

Riedman alleged Williams was excessively absent and tardy, and that she began missing work on a regular basis in January 1995. Rhoda Ryan kept handwritten notes of Williams's tardies and absences. She sent these, along with the calendars that she kept, to Tracy Borrosh, Riedman's assistant vice-president and personnel manager.

Williams alleged the recording of absences and late days was part of a concerted effort to have her terminated. This tracking was without the knowledge of Williams's supervisor. Williams said no one confronted her with alleged absenteeism or tardiness problems.

On April 21, 1995, James Riedman terminated Williams. At the time of her termination, Williams was earning $45,000.00 per year.

Williams suffered stress, depression, and financial hardship as a result of her termination. In August 1995, she accepted a lower paying position with Web–Kor, a local insurance agency.

In September 1995, Riedman alleged Williams was soliciting its clients. Riedman notified Williams that she was violating her Non–Piracy Agreement. Williams did not respond to this letter.

Approximately one month later, Williams filed this lawsuit. After a three-day trial, the jury returned a verdict for Williams on the breach of contract and breach of covenant of good faith and fair dealing claims. The trial judge instructed the jury that if it entered a verdict in favor of Williams, it must also find for Williams on Riedman's counterclaim for breach of the Non–Piracy Agreement.

The jury awarded Williams $88,448.00 in actual damages for breach of contract, and $179,440.00 in actual damages and $26,789.00 in punitive damages for breach of covenant of good faith and fair dealing. The jury found in favor of the defendants on Williams's causes of action for negligent misrepresentation, fraud, and conspiracy. The judge granted Williams's directed verdict motion on the violation of the Uniform Trade Secrets Act.[1] Riedman appeals.

## DISCUSSION

### I. Employee Manual as a Contract

Riedman argues the trial judge erred by not granting a directed verdict for the claims of breach of contract and

---

1. At trial, Riedman withdrew its counterclaim for breach of contract accompanied by fraudulent act. Although the reason is unclear in the record, Williams's remaining causes of actions for unfair trade practices and tortious interference with a contract were not submitted to the jury.

breach of the covenant of good faith and fair dealing. Specifically, Riedman contends the employee manual did not constitute a binding contract that altered Williams's at-will status.

When reviewing the denial of a motion for directed verdict or judgment notwithstanding the verdict, we must consider the evidence in the light most favorable to the non-moving party. *Brady Dev. Co. v. Town of Hilton Head Island,* 312 S.C. 73, 439 S.E.2d 266 (1993). A directed verdict or judgment notwithstanding the verdict should not be granted unless only one reasonable inference can be drawn from the evidence. *Id.*

Because this was an action for breach of a contract, it is an action at law. *Leahy v. Starflo Corp.,* 314 S.C. 546, 431 S.E.2d 567 (1993). Our review of an action at law tried by a jury extends merely to correcting errors of law. We will not disturb the facts determined by the jury unless there is no evidence which reasonably supports the jury's findings. *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976); *Brown v. Smalls,* 325 S.C. 547, 481 S.E.2d 444 (Ct.App.1997).

An individual working for an employer under a contract of employment for an indefinite period can be terminated at will. *Shealy v. Fowler,* 182 S.C. 81, 188 S.E. 499 (1936). Termination of an at-will employee does not normally give rise to a cause of action for breach of contract. *Hudson v. Zenith Engraving Co.,* 273 S.C. 766, 259 S.E.2d 812 (1979). However, when the at-will status of the employee is altered by the terms of an employee handbook, thereby creating a contractual employment relationship, a cause of action for wrongful discharge may arise. *Small v. Springs Indus., Inc.,* 292 S.C. 481, 357 S.E.2d 452 (1987) (*Small I* ).

The existence of a contract for employment should be submitted to the jury when (1) its existence is questioned, and (2) the evidence is conflicting or admits of more than one inference. *Small I,* 292 S.C. at 483, 357 S.E.2d at 454; *Jones v. General Elec. Co.,* 331 S.C. 351, 503 S.E.2d 173 (Ct.App. 1998), *cert. denied,* (May 14, 1999). The relevant issues for determining if the handbook forms a contract are whether (1) the handbook sets out procedures binding on the employer, (2)

those procedures applied to the employee, and (3) the employer violated those procedures. *Miller v. Schmid Labs., Inc.,* 307 S.C. 140, 414 S.E.2d 126 (1992); *Jones,* 331 S.C. at 358, 503 S.E.2d at 177.

## A.

Riedman asserts Williams failed to establish the employee manual constituted a contract that altered her at-will status either because of mandatory language in the manual or because of oral statements made by her supervisors.

Williams argues the employee manual contained language which was binding on Riedman, specifically that she be treated fairly and that a progressive disciplinary process be followed. She asserts that combining the language of the employee manual, the disciplinary procedures detailed on the back of the absentee calendar, and the employee disciplinary report form created a progressive disciplinary process that Riedman was bound to follow prior to termination. She contends she was wrongfully terminated for excessive absences when she was not given any warning prior to her termination. Williams argues the jury should determine whether a contract existed and, if so, whether Riedman breached that contract.

The employee manual contained the following relevant language:

> Observance of work rules is essential to the orderly conduct of business, and benefits both you and the company. Failure to observe these rules, or any other policies listed in this manual, can result in disciplinary action. Disciplinary action is normally progressive, starting with a verbal warning, and ending with dismissal if appropriate corrective action is not taken.

> Immediate dismissal can follow the use of rude, discourteous or profane language to clients or other employees; theft or dishonesty; damaging or willfully misusing company property; falsifying or willfully omitting company records or reports; failure to adhere to established accounting or bookkeeping procedures; or possessing or reporting to work under the influence of alcohol or any illegal drug.

The manual also contains a subsection entitled "Tardiness and Absenteeism." That section states:

Prevention of tardiness and absenteeism is vital to the efficient operation of the business. Repeated lateness and absence can be cause for dismissal. Please report to your supervisor as early as possible if you anticipate being late or absent for any reason.

Additionally, the manual contained a pledge by Riedman to, among other things, "Assure equal treatment of all who work for the company by applying policies and procedures fairly throughout all company offices."

Viewing the evidence in the light most favorable to Williams, a jury issue exists concerning whether the employee manual, related documents, and any oral representations created a binding employment contract which altered Williams's at-will status. The employee manual contained several sections relating to disciplinary procedure. The manual stated disciplinary action was normally progressive. The offenses which warranted immediate dismissal did not include excessive absenteeism or tardiness.

Riedman's employee disciplinary reports and absentee calendars also give rise to an inference that discipline was normally progressive. The employee disciplinary report form contains a section entitled "Action to be Taken," which lists a four-step process including a warning, probation, suspension, and dismissal. The absentee calendar includes a section entitled "Record of Communications Involving Excessive Absence." This section allows for reporting dates that verbal warnings and written notices were provided to the employee for excessive absences.

Williams indicated she believed discipline was normally progressive. Based on the employee manual and her discussions with Riedman, Williams stated she should have been given a warning prior to her termination. Williams testified that when she raised concerns to James Riedman about whether she could be terminated for any reason, he told her the "Riedman Corporation was a very fair company. That I would not have to have any concerns that I would ever be treated unfairly." Moreover, she also discussed the company's disciplinary procedure with Tracy Borrosh, Riedman's assistant vice-president and personnel manager. Based on this meeting and her review of the employee manual, Williams

believed discipline was to be progressive, starting with a verbal warning and followed by written warnings.

Richard Kay, Williams's supervisor, also testified he understood discipline was to be progressive. Kay was aware of the employee disciplinary form, which outlined a four-step disciplinary process. Additionally, he believed the procedure involved a warning, followed by a written letter to the employee's personnel file, and finally termination.

Both James Riedman and Borrosh stated discipline was normally progressive. However, they stated whether the four-step procedure was followed depended on the particular infraction. Ryan also acknowledged she thought the four-step disciplinary procedure was supposed to be used in cases of excessive absences.

■ Because the evidence is conflicting as to whether the terms of Riedman's employee manual were mandatory or permissive and whether Williams received oral assurances sufficient to create an employment contract, we find the trial judge properly denied Riedman's motions for a directed verdict on Williams's claims for breach of contract and breach of the covenant of good faith and fair dealing. *See Small I*, 292 S.C. at 483–84, 357 S.E.2d at 454 (The question is for the fact finder if a handbook and other evidence creates conflicting inferences as to whether the employer altered the employee's at-will status.); *Kumpf v. United Tel. Co. of the Carolinas*, 311 S.C. 533, 429 S.E.2d 869 (Ct.App.1993) (If the existence of a contract is disputed and the evidence creates more than one reasonable inference, the question is one for the jury).

## B.

Riedman argues that, even if the employee manual contained mandatory language, or could create a contract, the manual contained a valid disclaimer. Additionally, Riedman claims Williams had actual notice and knowledge of the disclaimer based on the other documents she received in conjunction with the employee manual.

The disclaimer in Riedman's employee manual was located in the first paragraph on the first page in the "Introduction and History" section. It states:

Welcome to Riedman Corporation. This manual is intended to inform you of the company's history and goals and to outline how the company operates. While the manual is not a contract of employment, it does provide every employee with the details of day-to-day company routine, together with an outline of work rules and employees' benefits and rights. Thus it is important for every employee to read it carefully and to keep it for reference should any question or problem arise. The card that accompanies the manual should be signed and returned. It acknowledges your receipt of the manual and the information it contains.

 If an employer wishes to issue an employee manual without being bound by it, the employer must insert a conspicuous disclaimer or provision into the written document. *Small I*, 292 S.C. at 485, 357 S.E.2d at 455. However,

[T]he disclaimer is merely one factor to consider in ascertaining whether the handbook as a whole conveys credible promises that should be enforced.... [A] handbook that contains both promissory language and a disclaimer should be viewed as inherently ambiguous.... As with any question of fact, this is primarily a matter for the jury to decide. The court should intervene to resolve the handbook issue as a matter of law only if the handbook statements and the disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist.

*Fleming v. Borden, Inc.*, 316 S.C. 452, 463–64, 450 S.E.2d 589, 596 (1994) (quoting Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers*, 13 Indus.Rel.L.J. 326, 375–76 (1991–92)).

 In *Hannah v. United Refrigerated Services, Inc.*, 312 S.C. 42, 430 S.E.2d 539 (Ct.App.1993), we determined that a disclaimer in the manual's "Welcome" section, which was not otherwise set off, was not conspicuous. We stated, "[t]he test for conspicuousness is whether there is something about the provision that reasonably calls attention to it." *Id.* at 46, 430 S.E.2d at 541–42. If the disclaimer is not capitalized, in bold lettering, set apart with a distinctive border, or in some other way set off from the general text, the disclaimer is ineffectual. *Id.; cf. Marr v. City of Columbia*, 307 S.C. 545, 416 S.E.2d 615 (1992) (disclaimer found to be conspicuous where it was placed

in large letters on the front cover of employee handbook, and then repeated in large bold type on a separate page of the handbook); *Kumpf v. United Tel. Co. of the Carolinas,* 311 S.C. 533, 429 S.E.2d 869 (Ct.App.1993) (disclaimer located on the last page in the "conclusion" section of the employee handbook was not conspicuous where it was not capitalized, bolded, set apart with distinctive border, or in contrasting type or color).

Turning to the facts of this case, we cannot say as a matter of law that the provision relied on by Riedman was sufficiently conspicuous to be a valid disclaimer. Although it is located in the first paragraph of the employee manual, it is not capitalized, in bold type, or in any other way set-off. Accordingly, the determination of whether the disclaimer was conspicuous was a factor for the jury to consider in determining whether there was an employment contract. *See Fleming,* 316 S.C. at 464 n. 6, 450 S.E.2d at 596 n. 6 (question of whether a disclaimer is conspicuous is a fact question).

Furthermore, we reject Riedman's contention that Williams's actual notice and knowledge of the disclaimer precluded her reliance on the documents as an employment contract. Riedman asserts Williams knew she did not have a contract of employment because she signed the following documents: the offer of employment which indicated her employment was not for a definite term; an applicant's statement which stated she was employed at-will; and an acceptance card which indicated she had received and reviewed the employee manual.

Although Williams acknowledged she signed the documents when hired by Riedman, she testified no one ever discussed with her that she was an at-will employee. Moreover, specific reference to an at-will relationship was limited to a section of the employment application which Williams signed. This reference, which was not underlined or in distinctive type, included a two-sentence definition of an at-will relationship. Williams believed the employee manual was a contract because she was required to sign it before she was hired. Furthermore, the acceptance card only acknowledged that Williams had "received and reviewed" the employee manual, not that she had read and understood the disclaimer.

■ Therefore, the trial judge did not err in submitting this issue to the jury. *See Hannah,* 312 S.C. at 46–47, 430 S.E.2d at 542 (trial judge erred in granting summary judgment as to whether employee had actual notice of inconspicuous disclaimer where employee testified he only read parts of the employee handbook and where affidavit signed by employee upon receipt of the handbook did not indicate employee had read entire handbook and the disclaimer, nor did it include a separate provision ensuring that employee understood the handbook).

## II. Evidence of Breach

■ Riedman next argues there was no evidence of breach because the employee manual states that discipline is "normally progressive" and does not establish a set procedure. Moreover, the employee manual contains a provision, stating "Repeated lateness and absence can be cause for dismissal." As such, Riedman contends it had the right to immediately discharge Williams.

The evidence is conflicting concerning whether Riedman breached the employment contract by immediately terminating Williams.

Although Williams believed discipline was normally progressive, she was never notified of a problem with excessive absences prior to her termination. Kay also was never made aware of Williams's attendance problem until immediately before Riedman terminated her.

In contrast, both Riedman and Borrosh stated whether the four-step disciplinary procedure was followed depended on the particular infraction. Riedman testified he was justified in terminating Williams without a warning based on her attendance record, her decreasing production numbers, and two complaints that customers had made about Williams's service of their accounts.

The evidence concerning Williams's absenteeism and work performance is also in dispute. Williams questioned the accuracy of the days she was alleged to have been absent or tardy. Kay stated Williams had not been absent an inordinate amount of time and he never had problems with her performance.

Carol Gomez, a receptionist who worked for Riedman between April 1994 and May 1995, testified Williams called in on all days that she would be working out of the office. According to Gomez, Williams always stated where she could be reached when she was not in the office. Gomez also stated there were never any complaints about Williams.

Although the testimony of Borrosh, Ryan, and other Riedman employees supported Riedman's allegation that Williams was excessively absent, the documentation of these absences is conflicting. Borrosh testified that at the beginning of April 1995, Ryan informed her that Williams had been out of the office a lot in the preceding months. Ryan kept track of employees' sick days and vacation days on two personal calendars in the office. She then transferred the information to employee calendar cards and absentee calendars.

On April 6, 1995, Ryan sent Borrosh Williams's 1995 absentee calendar. Subsequently, Borrosh reviewed the absentee calendar in conjunction with Ryan's handwritten notes. Based on this information, Borrosh added tardy days to the calendar. She then took this information directly to James Riedman, who instructed Borrosh to charge Williams with "vacation days" for the days that she had been absent. In a memo dated April 20, 1995, Williams was informed she had been charged with five sick days and thirteen vacation days. The memo also indicated she had two remaining vacation days. Riedman made the decision to terminate Williams on April 21, 1995.

When Williams reviewed the memo and absentee calendar, she noted there were errors. She asserted she was charged with vacation days for days that she had been working. Because she was terminated the next day, Williams never had an opportunity to look at Ryan's documentation.

Ryan testified there were discrepancies between the two 1995 absentee calendars prepared for Williams. She indicated there were notations that were not in her handwriting, tardy days were noted, and some of the "sick day" codes had been changed. According to Ryan, these changes were made by the corporate office.

The evidence of breach is conflicting. Therefore, the jury should make this determination. *See Small I*, 292 S.C. at 483–

84, 357 S.E.2d at 454 (question of whether employee handbook, bulletin, and the oral assurances constituted an employment contract was for the jury's determination; if the jury found the existence of an employment contract, then it had to decide whether or not employer reasonably could have determined that employee's actions constituted a serious offense which could result in discharge without the four-step disciplinary process).

## III. Breach of Implied Covenant of Good Faith and Fair Dealing

Riedman additionally argues the cause of action for breach of implied covenant of good faith and fair dealing should be in contract rather than tort. Therefore, as a contract claim, it cannot support an award of punitive damages.

■ "Although implied covenants are not favored in the law, . . . there exists in every contract an implied covenant of good faith and fair dealing." *Commercial Credit Corp. v. Nelson Motors, Inc.*, 247 S.C. 360, 366–67, 147 S.E.2d 481, 484 (1966). Breach of this covenant has been recognized as a cause of action in the employment context in South Carolina. Specifically, we have stated, "[W]e find no authoritative case law holding the implied covenant of good faith and fair dealing is not applicable to employment contracts that alter the employee's at-will status." *Shelton v. Oscar Mayer Foods Corp.*, 319 S.C. 81, 91, 459 S.E.2d 851, 857 (Ct.App.1995), *aff'd*, 325 S.C. 248, 481 S.E.2d 706 (1997).

To date, a tort cause of action for breach of implied covenant of good faith and fair dealing appears only in the insurance arena under a claim for bad faith refusal to pay benefits. The Supreme Court stated:

In *Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 306 S.E.2d 616 (1983), we recognized the existence of a cause of action against an insurance company for bad faith refusal to pay first party benefits due under an insurance contract. In so doing we cited with approval the reasoning used in the seminal case of *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), that there is an implied covenant of good faith and fair dealing in every insurance contract "that neither party will do any-

thing to impair the other's rights to receive benefits under the contract." *Nichols,* 279 S.C. at 339, 306 S.E.2d at 618. *Tadlock Painting Co. v. Maryland Cas. Co.,* 322 S.C. 498, 500, 473 S.E.2d 52, 53 (1996).

Williams's cause of action for breach of implied covenant of good faith and fair dealing should only allow recovery of contract damages. Because an insurance relationship is decidedly different from an employment relationship, we decline to permit tort recovery for this cause of action.

## A.

The South Carolina cases which recognize bad faith as a tort cause of action place special emphasis on the relationship between an insurer and the insured. *See Tadlock,* 322 S.C. at 503, 473 S.E.2d at 55; *Nichols v. State Farm Mut. Auto. Ins. Co.,* 279 S.C. 336, 306 S.E.2d 616 (1983). The same special relationship does not exist in employment situations.

In *Tadlock,* the Supreme Court elaborates:

"[I]f the cause of action is predicated on the alleged breach, or even negligent breach, of a contract between the parties, an action in tort will not lie. On the other hand, where the contract creates a certain relationship between the parties; and certain duties arise by operation of law, irrespective of the contract, because of this relationship, then the breach of such duties warrants an action in tort." The duty of good faith and fair dealing is such a duty that arises by operation of law due to the special relationship of the parties in an insurance contract, as *Brown* itself noted.

*Tadlock,* 322 S.C. at 503 n. 5, 473 S.E.2d at 55 n. 5 (quoting *Brown v. South Carolina Ins. Co.,* 284 S.C. 47, 52–54, 324 S.E.2d 641, 644–46 (Ct.App.1984), *overruled on other grounds by Charleston County Sch. Dist. v. State Budget & Control Bd.,* 313 S.C. 1, 437 S.E.2d 6 (1993)) (citations omitted).

South Carolina first recognized a tort cause of action for an insurer's unreasonable refusal to accept a settlement within the policy limits. *Tyger River Pine Co. v. Maryland Cas. Co.,* 170 S.C. 286, 170 S.E. 346 (1933). This doctrine has been extended to include the bad faith refusal to pay a first party claim by an insured. In *Nichols,* our Supreme Court stated, "The cause of action we consider today and that which is

commonly known as the 'Tyger River Doctrine,' are merely two different aspects of the same duty." *Nichols,* 279 S.C. at 339–40, 306 S.E.2d at 619. The Court explained its reasoning for holding the bad faith refusal to pay should be in tort and not contract:

> The public policy reasons for recognizing this cause of action are plentiful. The insurance business is affected with a public interest. *Hinds v. United Ins. Co. of America,* 248 S.C. 285, 149 S.E.2d 771 (1966). An insured ordinarily possesses no bargaining power and no means of protecting himself from the kind of treatment of which Respondent complained. "An insured does not contract to obtain any kind of commercial advantage or leverage but only to protect himself against the spectre of accidental [or unavoidable] loss." *Trimper v. Nationwide Ins. Co.,* 540 F.Supp. 1188, 1193 (D.C.S.C.1982).
>
> Absent the threat of a tort action, the insurance company can, with complete impunity, deny any claim they wish, whether valid or not. During the ensuing period of litigation following such a denial, the insurance company has the benefit of profiting on the use of the insured's money. Heretofore, the only compensation a successful insured could expect through litigation was the belated payment of his claim and the possibility of recovering attorney fees up to two thousand five hundred ($2,500.00) dollars.

*Nichols,* 279 S.C. at 340, 306 S.E.2d at 619. This same reasoning prevailed in *Tadlock.* Our Supreme Court, citing an Arizona case, stated:

> The court reasoned that an insured is not only bargaining for security from financial loss, the primary goal motivating the purchase of insurance, when it enters into an insurance contract. Rather, *"the insured also is entitled to receive the additional security of knowing that she will be dealt with fairly and in good faith. That security comes not from the express contractual terms, but from the implied covenant of good faith and fair dealing."* (emphasis added).

*Tadlock,* 322 S.C. at 502, 473 S.E.2d at 54 (quoting *Deese v. State Farm Mut. Auto. Ins. Co.,* 172 Ariz. 504, 838 P.2d 1265, 1269 (1992) (en banc)).

## B.

The reasoning for permitting tort recovery in the insurance context is well established. However, neither this Court nor our Supreme Court has addressed whether an employee can recover in tort from an employer for breach of an implied covenant of good faith and fair dealing. Accordingly, we look to other jurisdictions for guidance.

Although there is a split of authority, the majority of jurisdictions have concluded that an employee may not recover in tort for breach of an implied covenant of good faith and fair dealing. In a number of these cases, the courts explicitly declined to apply the special relationship that exists between an insured and insurer to the employment context. *See Hoffman–La Roche, Inc. v. Campbell,* 512 So.2d 725 (Ala. 1987); *ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150 (Alaska 1988); *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) (en banc); *Decker v. Browning–Ferris Indus. of Colorado, Inc.,* 931 P.2d 436 (Colo. 1997) (en banc); *Barry v. Posi–Seal Int'l, Inc.,* 40 Conn.App. 577, 672 A.2d 514 (1996); *E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436 (Del.1996); *Metcalf v. Intermountain Gas Co.,* 116 Idaho 622, 778 P.2d 744 (1989); *Martin v. Federal Life Ins. Co.,* 109 Ill.App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998 (1982); *Maddaloni v. Western Mass. Bus Lines, Inc.,* 386 Mass. 877, 438 N.E.2d 351 (1982); *Noye v. Hoffmann–La Roche, Inc.,* 238 N.J.Super. 430, 570 A.2d 12 (1990); *Bourgeous v. Horizon Healthcare Corp.,* 117 N.M. 434, 872 P.2d 852 (1994); *Nelson v. WEB Water Dev. Ass'n,* 507 N.W.2d 691 (S.D.1993); *Berube v. Fashion Ctr., Ltd.,* 771 P.2d 1033 (Utah 1989); *Dvorak v. Pluswood Wisconsin, Inc.,* 121 Wis.2d 218, 358 N.W.2d 544 (Ct.App.1984); *see also Best Place, Inc. v. Penn America Ins. Co.,* 82 Hawai'i 120, 920 P.2d 334, 346 (1996) ("[T]he availability of a tort recovery for breach of the implied covenant of good faith and fair dealing may be justified in actions brought on insurance contracts, but not necessarily in actions brought on other types of contract."); *Miller Brewing Co. v. Best Beers of Bloomington, Inc.,* 608 N.E.2d 975 (Ind.1993) (Punitive damages are not allowed in a breach of contract action.); *Hrehorovich, M.D. v. Harbor Hosp. Ctr., Inc.,* 93 Md.App. 772, 614 A.2d 1021 (1992) (existence of an implied covenant of good faith and fair dealing

is dependent on the existence of an employment contract with a definite term); *Story v. City of Bozeman*, 242 Mont. 436, 791 P.2d 767, 775 (1990) ("[E]very contract, regardless of type, contains an implied covenant of good faith and fair dealing. A breach of the covenant is a breach of the contract."); *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86 (1983) ("[I]n appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied will be enforced. In such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties.") (citation omitted).

A minority of states recognize a tort claim for breach of a covenant of good faith and fair dealing by applying the insurance analogy. The type of employment situations which give rise to this recovery are, however, extremely limited. *See K Mart Corp. v. Ponsock*, 103 Nev. 39, 732 P.2d 1364, 1370 (1987) (where nationwide employer terminated employee in bad faith for the improper motive of defeating contractual retirement benefits, employee entitled to punitive damages; Court reasoned, "[A]lthough a duty of good faith and fair dealing is created by law in all cases, it is only in rare and exceptional cases that the duty is of such a nature as to give rise to tort liability. The kind of breach of duty that brings into play the bad faith tort arises only when there are special relationships between the tort-victim and the tortfeasor...."), *abrogated by Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (ERISA pre-empts state wrongful discharge actions based on employer interference with rights under employee benefit plan); *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 222 (Wyo.1994) ("When a special relationship of trust and reliance is demonstrated, a breach of the implied covenant is actionable as a tort. Therefore, compensatory damages are available to hold employers accountable for a breach of the implied covenant.") (citation omitted).[2]

---

2. We note that several jurisdictions decline to recognize the applicability of an implied covenant of good faith and fair dealing in an employment relationship. *See, e.g., Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198 (Iowa 1997); *Dahlman v. Oakland Univ.*, 172 Mich.App. 502, 432 N.W.2d 304 (1988); *Hunt v. IBM Mid America Employees Fed.*

We are persuaded by the reasoning in the seminal case of *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) (en banc). In *Foley*, the California Supreme Court found that a cause of action for breach of the implied covenant of good faith and fair dealing existed in employment contract actions, but it was limited to contractual damages and was not in tort. The Court stated:

> An allegation of breach of the implied covenant of good faith and fair dealing is an allegation of breach of an "ex contractu" obligation, namely one arising out of the contract itself. The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes. The insurance cases thus were a major departure from traditional principles of contract law. We must, therefore, consider with great care claims that extension of the exceptional approach taken in those cases is automatically appropriate if certain hallmarks and similarities can be adduced in another contract setting.

*Foley*, 254 Cal.Rptr. 211, 765 P.2d at 394. The Court specifically rejected the contention that the employment relationship was analogous to that of insurance thereby warranting a right to tort recovery for breach of an implied covenant. *Id.* at 395.

The Court reasoned that "a breach in the employment context does not place the employee in the same economic dilemma that an insured faces when an insurer in bad faith refuses to pay a claim or to accept a settlement offer within policy limits." *Id.* at 396. It noted that when an insurer acts in bad faith, the insured cannot turn to the marketplace and find another insurance company willing to pay for the loss. *Id.* In contrast, an employee who is terminated is able to seek alternative employment. *Id.* The Court also emphasized the fundamental difference between insurance and employment relationships. *Id.* In the insurance relationship, the insurer and the insured are financially at odds. *Id.* In comparison, "[t]he interests of employer and employee are most frequently

---

*Credit Union*, 384 N.W.2d 853 (Minn.1986); *Edelman v. Franklin Iron & Metal Corp.*, 87 Ohio App.3d 406, 622 N.E.2d 411 (1993); *Day & Zimmermann, Inc. v. Hatridge*, 831 S.W.2d 65 (Tex.Ct.App.1992); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984) (en banc).

in alignment" because "it is to the employer's economic benefit to retain good employees." *Id.*

> In view of these marked differences, the Court concluded: [T]he employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies in view of the countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and finally, the numerous protections against improper terminations already afforded employees.

*Id.* at 396.

"Initially, the concept of a duty of good faith developed in contract law as 'a kind of "safety valve" to which judges, may turn to fill gaps and qualify or limit rights and duties otherwise arising under the rules of law and specific contract language.' " *Foley,* 254 Cal.Rptr. 211, 765 P.2d at 389 (citing Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization,* 67 Cornell L.Rev. 810, 812 (1982)). Since its application in this state, South Carolina appellate courts have consistently given credence to the underlying purpose of the doctrine of good faith and fair dealing by using it to protect the intentions of the parties to the contract. *See Commercial Credit Corp. v. Nelson Motors, Inc.,* 247 S.C. 360, 367, 147 S.E.2d 481, 484 (1966) (" '[T]erms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face.' " (quoting 17A C.J.S. *Contracts* § 328 at 282–84)); *Id.* (" 'In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made.' ").

Other than the limited insurance context, courts of this state have effectuated this underlying purpose by applying contract law to a claim for breach of the implied covenant of good faith and fair dealing. *See Tharpe v. G.E. Moore Co.,* 254 S.C. 196, 174 S.E.2d 397 (1970) (There exists in every contract an implied covenant of good faith and fair dealing.); *Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 334 S.C. 469, 514 S.E.2d 126 (1999) (A breach of covenant of good faith and fair

dealing cannot stand if the party seeking damages has not performed under the contract.); *Id.* at 487, 514 S.E.2d at 135 ("[O]ne who seeks to recover damages for breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was, at the appropriate time, able, ready, and willing to perform it." (quoting *Parks v. Lyons,* 219 S.C. 40, 48, 64 S.E.2d 123, 126 (1951))); *Adams v. G.J. Creel & Sons, Inc.,* 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995) ("[T]here is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do."). Notably, we have declined to apply this covenant to the employment at-will situation where no contract exists. *Keiger v. Citgo, Coastal Petroleum, Inc.,* 326 S.C. 369, 482 S.E.2d 792 (Ct.App.1997) (affirming trial judge's dismissal of cause of action for breach of implied covenant of good faith and fair dealing where employee failed to allege in her complaint that her at-will employment status had been altered).

■ As evidenced by these cases, the implied covenant of good faith and fair dealing has been viewed as another contract term. Under a breach of contract claim, a party's damages are limited to those under the contract, and no tort remedies are available, including punitive damages. *Small v. Springs Indus., Inc.,* 300 S.C. 481, 484, 388 S.E.2d 808, 810 (1990) (*Small II* ) (where employment contract is for an indefinite term, "[a] wrongfully discharged employee suing for breach of contract is entitled to receive the amount of the employee['s] net losses caused by the employer's breach. Such losses may include back pay as well as future damages.") (citations omitted). Logically, only contract damages would be available for a breach of the implied covenant of good faith and fair dealing.

■ In view of our decision that tort remedies are not available for a breach of the implied covenant of good faith and fair dealing in the employment context, it was improper for Williams to collect punitive damages. As such, we need not address Riedman's argument that there was no evidence of willful, wanton, or reckless conduct warranting recovery of punitive damages.

## IV. Election of Remedies

Riedman argues the trial judge should have granted its motion for election between the remedies for breach of contract and breach of the implied covenant of good faith and fair dealing.

■■■■■ "Election of remedies involves a choice between different forms of redress afforded by law for the same injury or different forms of proceeding on the same cause of action." *Taylor v. Medenica,* 324 S.C. 200, 218, 479 S.E.2d 35, 44 (1996). The basic purpose of election of remedies is to prevent double recovery for a single wrong. *Save Charleston Found. v. Murray,* 286 S.C. 170, 333 S.E.2d 60 (Ct.App.1985). "When an identical set of facts entitle the plaintiff to alternative remedies, he may plead and prove his entitlement to either or both; however, the plaintiff may not recover both." *Id.* at 175, 333 S.E.2d at 64.

Both the breach of contract and the breach of implied covenant of good faith and fair dealing arose from Williams's improper termination. In each case she was only entitled to recover damages under the contract. Because we have determined the covenant of good faith and fair dealing is an implied term of the employee manual, Riedman's breach of that term and breach of express terms of the contract result in the same damages.

■■■ Accordingly, Williams must elect between the breach of contract damages and the breach of the covenant of good faith and fair dealing damages. If Williams elects to recover under the breach of the covenant of good faith and fair dealing claim, she is limited to the verdict for $179,440 in actual damages because, as stated above, punitive damages may not be recovered under this theory.

## V. Jury Consideration of Separate Non–Piracy Agreement

■■■ Riedman argues the trial judge erred in instructing the jury that it could not consider the counterclaim for breach of the Non–Piracy Agreement if it found in favor of Williams on any cause of action.

The trial judge instructed the jury as follows:

Now, in regard to the counter claim that has been brought by the defendant. If you should conclude that the Plaintiff is entitled to a verdict, then the counter claim would be of no concern to you. But if you should conclude that the plaintiff is not entitled to a verdict, then you would proceed to consider the defendant's counter claim.

Although there are no South Carolina state court decisions which specifically address this issue, we are persuaded by the reasoning of a South Carolina United States District Court case. *See Associated Spring Corp. v. Roy F. Wilson & Avnet, Inc.*, 410 F.Supp. 967 (D.S.C.1976).

In *Associated Spring,* Wilson was hired by Associated Spring as a salesman. The employment contract contained a two-year restrictive covenant which prohibited Wilson from soliciting sales from Associated Spring's customers if he left the corporation. After approximately two and a half years, Wilson resigned from the corporation. He asserted the corporation breached the terms of the employment contract by making new sales territory assignments and assigning Wilson's exclusive accounts to other salesmen. Shortly after his resignation another corporation, Avnet, hired Wilson. Wilson then began soliciting Associated Spring's customers on behalf of that corporation. Subsequently, Associated Spring brought an action to enjoin Wilson from further violating the restrictive covenant, and to enjoin Avnet from participating in and benefitting from Wilson's violation of the covenant. Associated Spring also sought actual and punitive damages for Wilson's and Avnet's past violations. Wilson and Avnet admitted to violating the covenant, but contended the covenant was unenforceable because of the corporation's prior breach of Wilson's employment contract.

The South Carolina United States District Court, applying South Carolina law in this diversity action, found Associated Spring's breach of the contract precluded it from enforcing the restrictive covenant. *Id.* at 979. In reaching this conclusion, the Court relied on equitable principles, primarily the "clean hands" doctrine and the doctrine that one who seeks equity must do equity. *Id.* at 977–78. The Court found these equitable principles superseded the contract provision which specifically stated the restrictive covenant was independent

from any other provision of the agreement and would be enforceable despite a claim or cause of action against the corporation. *Id.* at 977.

Turning to the instant case, Riedman argues *Associated Spring* is inapplicable because the Non–Piracy Agreement was separate or severable from the contract that Williams claimed altered her at-will status. As such, the Non–Piracy Agreement was enforceable even if Riedman breached the employment contract. Because the issue of whether a contract is severable depends on the intent of the parties, which requires a factual determination by the jury, Riedman contends the trial judge erred in instructing the jury concerning Riedman's counterclaim.

Although the Non–Piracy Agreement was given to Williams in the form of a letter which was separate and arguably independent from the employment manual, this fact does not appear dispositive in light of the analysis in *Associated Spring.* In *Associated Spring,* the parties specifically agreed in a written contract that the restrictive covenant was independent and enforceable despite a claim or cause of action against the corporation. Nevertheless, the court held the corporation's breach precluded it from enjoining Wilson from further violating the restrictive covenant and from recovering damages for past violations. Here, there were no specific contractual provisions, but rather, Williams's status as an at-will employee was altered by the employee manual, related documents, and oral representations. Because the contract is implied in this case, the reasoning in *Associated Spring* is even more persuasive.

We adopt the analysis in *Associated Spring* for several reasons. First, the district court applied South Carolina law in reaching its decision. Second, the Court's holding is consistent with this state's contract law. *See, e.g., Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 334 S.C. 469, 487, 514 S.E.2d 126, 135 (1999) (" '[O]ne who seeks to recover damages for breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was, at the appropriate time, able, ready, and willing to perform it.' " (quoting *Parks v. Lyons,* 219 S.C. 40, 48, 64 S.E.2d 123, 126 (1951))). Finally, the *Associated Spring* deci-

sion is consistent with the majority rule established by other jurisdictions. Specifically, "[i]t has been generally held that a restrictive clause in an employment or business sale contract preventing future competition by the employee or seller, or preventing an employee from performing services for others during the existence of the employment relationship, may not be enforced by the employer or a purchaser where there has been a breach by the latter of his own obligations under the contract." *See* T.C. Williams, Annotation, *Restrictive Clause in Employment or Sales Contract to Prevent Future Competition or Performance of Services for Others as Affected By Breach By Party Seeking to Enforce It, of His Own Obligations Under the Contract,* 155 A.L.R. 652, 654 (1945).

In light of the foregoing, we find the trial judge properly instructed the jury concerning Riedman's counterclaim for breach of the Non–Piracy Agreement.

## VI. Trade Secrets Act

Riedman argues the trial judge erred in directing a verdict on the counterclaim for violation of the Uniform Trade Secrets Act (UTSA), S.C.Code Ann. §§ 39–8–1 to –11 (Supp. 1996).[3] Specifically, Riedman contends there was sufficient evidence to submit this cause of action to the jury.

Although the threshold inquiry is whether there is a trade secret to be protected, we are not required by the facts of this case to make that initial determination. *Lowndes Prods., Inc. v. Brower,* 259 S.C. 322, 191 S.E.2d 761 (1972) (The threshold issue in any trade secrets case is not whether there was a confidential relationship or a breach of contract or some other kind of misappropriation, but whether, there was a trade secret to be misappropriated.). Assuming without deciding Riedman's customer information constituted a trade secret, we find there was no evidence Williams misappropriated this information.

---

3. Riedman alleged Williams misappropriated its confidential customer information after she was terminated in April 1995. (R. 31–34) At that time, the Uniform Trade Secrets Act was in effect. *See* S.C.Code Ann. §§ 39–8–1 to –11 (Supp.1996). This Act was repealed on May 21, 1997, by the South Carolina Trade Secrets Act. *See* S.C.Code Ann. §§ 39–8–10 to –130 (Supp.1999). The new Act applies to causes of action which occur after July 1, 1997. S.C.Code Ann. § 39–8–130 (Supp.1999).

The UTSA does not specifically address employee misappropriation of trade secrets. The Act does, however, broadly define the possible theories of misappropriation. Within this broad definition, we believe the following provisions are applicable in this case:

(2) "Misappropriation" means:

. . .

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

. . .

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

. . .

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

S.C.Code Ann. § 39–8–1(2)(ii)(B)(II) (Supp.1996); *see* Kirk T. Bradley, Note, *Employees Beware: Employer Rights Under the South Carolina Trade Secrets Act,* 49 S.C.L.Rev. 597, 603–08 (1998); *see also* Richard E. Day, *Protection of Trade Secrets in South Carolina,* 42 S.C.L.Rev. 689, 704 (1991).[4]

When Riedman purchased the Kay Agency and hired Williams, Williams had a book of business which consisted of 148 clients. Williams testified she acquired these customers over a six-year period. While employed with Riedman, Williams acquired fifty-seven additional accounts. According to Williams, the eleven clients she serviced at Web–Kor were from her original 148 accounts. She further testified that while employed with Riedman, she did not gain any additional or "secret information" about these customers.

---

4. We note the General Assembly's 1997 enactment of the South Carolina Trade Secrets Act specifically addressed employee misappropriation of trade secrets. S.C.Code Ann. § 39–8–30(B) (Supp.1999) ("Every employee who is informed of or should reasonably have known from the circumstances of the existence of any employer's trade secret has a duty to refrain from using or disclosing the trade secret without the employer's permission independently of and in addition to any written contract of employment, secrecy agreement, noncompete agreement, nondisclosure agreement, or other agreement between the employer and the employee."); Kirk T. Bradley, Note, *Employees Beware: Employer Rights Under the South Carolina Trade Secrets Act,* 49 S.C.L.Rev. 597, 598 (1998).

When Williams left Riedman she only had customers' names. Because she had limited customer information, she "had to go in their office and they shared with [her] their policy limit, sales information, payroll information, the same thing that they were giving other competitors to compete against [Riedman]." She did not have any "memory or files or anything to that nature that enabled [her] to compete more against him than anyone else." She stated "[t]he only thing that I had in my favor was my four or five year relationship with that customer."

Williams also denied she had a plan to solicit Riedman customers after her termination. She testified the eleven clients that transferred to Web–Kor contacted her. Two of these clients testified on behalf of Williams.[5]

Nancy Kahrs, who was responsible for obtaining insurance for one of Williams's clients, testified she had known Williams for approximately eight years. Kahrs stated Williams had written insurance for her company from the time she was employed with the Kay Agency. When Riedman purchased the Kay Agency, Kahrs allowed her company's policy to remain with Riedman because Williams continued to handle it. After Williams was terminated by Riedman, Kahrs renewed her company's policy for another year with Riedman. At the end of the renewal period, Kahrs became dissatisfied with the service she had received from Riedman. As a result, she made the decision to put in bids to six other insurance companies. One of those companies was Web–Kor. Kahrs discovered Williams was employed with Web–Kor when she saw her at a meeting the two regularly attended. Kahrs testified she ultimately chose Web–Kor because its prices

---

**5.** Williams presented this evidence after she moved to dismiss Riedman's cause of action based on the UTSA. At the close of her reply testimony, both parties generally renewed their motions. The trial judge dismissed the cause of action after closing arguments. In light of this procedural posture, this Court is entitled to review the testimony of Williams's rebuttal witnesses in reaching our decision on this issue. *Cf. Stokes v. Denmark Emergency Med. Servs.*, 315 S.C. 263, 433 S.E.2d 850 (1993) (where party alleging trial judge erred in denying its motions for a directed verdict and judgment notwithstanding the verdict presented evidence after its first motion, appellate court was required to look at all of the evidence in reviewing the denial of party's second motion made after the close of all the evidence).

were competitive and she knew the kind of service she would receive from Williams.

Ann Strickland, who was responsible for procuring insurance for her company, testified she had known Williams since the late 1970's. At the time Strickland began working with the company's insurance, Williams was employed with the Kay Agency. Strickland stated she placed all of her company's insurance with Williams because she received good service. Strickland kept her insurance with Williams after Riedman purchased the Kay Agency. After Williams was terminated from Riedman, Strickland became dissatisfied with the service she received. When Strickland's company's policy came up for renewal, she put in bids to other insurance companies. During this process, Strickland called Williams at home. Williams indicated to Strickland that she was looking for a job at several insurance companies, including Web–Kor. Strickland contacted each of these companies and "tracked down" Williams at Web–Kor. Strickland then placed some of her company's insurance with Web–Kor.

Although Riedman testified Williams began calling his customers after she was terminated, the only evidence presented to support this allegation was: (1) a letter from Richard Kay to Riedman stating Williams had taken four accounts; (2) letters from former customers indicating they were transferring their business to Web–Kor; and (3) Web–Kor memos signed by Williams indicating these changes.

Initially, we note Riedman does not contend, nor is there any evidence, that Williams took any tangible customer information. In terms of using the customer information, we do not believe the mere fact that a select number of Riedman's clients transferred to Web–Kor after Williams's termination is sufficient to establish that Williams misappropriated trade secrets. There is no evidence Williams actively solicited these customers. Of the eleven clients Riedman claims Williams solicited, all eleven were clients that she had serviced since her employment with the Kay Agency. Williams did not obtain any additional information on these clients while employed with Riedman. There is no evidence these clients' decision to transfer their business to Web–Kor was the result of active solicitation on the part of Williams.

As such, there is no evidence to show Williams's actions constituted misappropriation of a trade secret. Accordingly, the trial judge properly directed a verdict on this cause of action. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, or judgment upon any ground(s) appearing in the Record on Appeal."); *cf. Hilb, Rogal & Hamilton Ins. Servs. of Orange County, Inc. v. Robb,* 33 Cal.App.4th 1812, 39 Cal.Rptr.2d 887 (1995) (Even assuming that insurance agency's customer list and other client information constituted trade secrets, former employee did not misuse them by informing some of agency's clients of his change of employment and then complying with their instructions to move their accounts or seek quote on desired type of insurance; UTSA did not prohibit clients from providing former employee with information such as amount and types of insurance); *Carolina Chem. Equip. Co. v. Muckenfuss,* 322 S.C. 289, 471 S.E.2d 721 (Ct.App.1996) (where seller of industrial cleaning equipment and supplies brought action against former employee for interference with contractual rights, misappropriation of trade secrets, and breach of contract, trial judge erred in failing to grant former employee's motions for directed verdict and judgment notwithstanding the verdict on the trade secrets cause of action where there was no evidence that former employee used or disclosed any trade secret of employer when former employee, six months after the expiration of the noncompetition period, contacted some of employer's customers and sold products similar to those of former employer which were based on formulae that was readily available from suppliers of raw materials).

## VII. Requiring of Second Round of Closing Arguments/Denial of Mistrial

Riedman argues the trial judge's decision to allow the conspiracy claim to go to the jury after granting a directed verdict, and requiring that both attorneys present a second set of closing arguments on that specific claim was prejudicial. Therefore, Riedman asserts the trial judge erred in denying its motion for a mistrial.

Prior to the parties' closing arguments, the trial judge directed a verdict in favor of Riedman on the conspiracy cause of action. As such, Riedman's counsel did not discuss conspir-

acy during closing arguments. Williams's counsel, however, referenced the conspiracy claim when she stated that Riedman's counsel had "sort of slopped off" this cause of action during closing arguments. The trial judge sustained Riedman's objection to this comment.

After closing arguments, the trial judge reversed his decision and permitted the conspiracy cause of action to be submitted to the jury. As a result, he reopened closing arguments and permitted counsel to address the conspiracy claim. Riedman's counsel objected to this decision. She contended the ruling had the effect of emphasizing the conspiracy claim to the jury. The trial judge overruled the objection, but stated he would instruct the jury that counsel had misunderstood the court's prior ruling and were not at fault.

After the additional closing arguments, Riedman's counsel moved for a mistrial. Counsel asserted Riedman was prejudiced by the trial judge's decision on the ground the additional closing arguments emphasized to the jury the conspiracy cause of action. The trial judge denied this motion.

The conduct of trial is within the discretion of the trial judge. We will not disturb the judge's decision absent an abuse of that discretion or the commission of a legal error that resulted in prejudice for Riedman. *See Baber v. Greenville County*, 327 S.C. 31, 488 S.E.2d 314 (1997). The decision to grant a motion for a mistrial rests within the trial judge's discretion and his ruling should not be disturbed on appeal unless he abused his discretion. *Tucker v. Reynolds*, 268 S.C. 330, 233 S.E.2d 402 (1977).

Riedman has failed to show it was prejudiced by the trial judge's decision to grant additional closing arguments. First, the trial judge took full responsibility for the confusion which resulted in the need for additional closing arguments. He also told the jurors that "you're to attach no particular significance to the particular argument more than any other argument that you heard." Second, Riedman prevailed on the conspiracy claim, so it is difficult to see how the allowance of the cause of action to go to the jury and the additional time for closing arguments caused prejudice sufficient to warrant overturning the trial judge's discretion.

## CONCLUSION

Because there was sufficient evidence to establish the existence of an employment contract and that it was breached by Riedman, we affirm the trial judge's decision to deny Riedman's motions for directed verdict on Williams's claims for breach of contract and breach of covenant of good faith and fair dealing. Additionally, we affirm the trial judge's decision: 1) to instruct the jury that it could only consider Riedman's counterclaim for breach of the Non–Piracy Agreement if it did not find in favor of Williams on any of her claims; 2) to grant Williams's motion for a directed verdict as to Riedman's cause of action under the UTSA; and 3) to deny Riedman's motion for a mistrial. We reverse the trial judge's finding that Williams's cause of action for breach of covenant of good faith and fair dealing is a tort for which punitive damages may be recovered. In light of this holding, we remand for Williams to elect her remedy as between the breach of contract cause of action and the breach of covenant of good faith and fair dealing claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

ANDERSON, J., concurs and GOOLSBY, J., concurs in separate opinion.

GOOLSBY, Judge (concurring):

I agree with the majority opinion in all respects; however, I do not construe it to hold that a customer list cannot be a trade secret and therefore not protected under the South Carolina Uniform Trade Secrets Act.[1]

---

1. *See Carolina Chem. Equip. Co. v. Muckenfuss,* 322 S.C. 289, 296, 471 S.E.2d 721, 724 (Ct.App.1996) ("[I]n determining whether something is a trade secret, one must consider the extent to which the information is known outside of his business and the ease or difficulty with which the information could be properly acquired or duplicated by others."); *see also* Commissioners' Comment to 1992 Act No. 437 § 2 ("[R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis', and controlling plant access."); *American Credit. Indem. Co. v. Sacks,* 213 Cal.App.3d 622, 262 Cal.Rptr. 92, 97 (1989) (holding a customer list of an underwriter of credit insurance company was a trade secret because it facilitated solicitation of business to an "elite ... percent of those potential customers which already have

evinced a predisposition to purchase credit insurance"), *review denied* (November 16, 1989); *Ed Nowogroski Ins., Inc. v. Rucker,* 88 Wash.App. 350, 944 P.2d 1093, 1097 (1997) (holding "the common law rule prohibiting the solicitation of a former employer's customers with memorized confidential information remains intact under the [Uniform Trade Secrets Act]" and, further, an employer was entitled to damages under the Act for a former employee's solicitation of the employer's clients using memorized confidential information), *aff'd,* 137 Wash.2d 427, 971 P.2d 936 (1999).