1423

Sally G. YOUNG, Respondent v. CENTURY LINCOLN-MERCURY, INC., Appellant.

(396 S.E. (2d) 105)

Court of Appeals

*C. Diane Smock,* of *Yarborough, Moore & Smock,* Greenville, *for appellant.*

*O.G. Calhoun,* of *Haynsworth, Marion, McKay* and *Guerard,* Greenville, *for respondent.*

Heard Sept. 13, 1989.

Decided Dec. 4, 1989.

Order on Rehearing Aug. 21, 1990.

GARDNER, Judge:

Sally G. Young (Young) sued Century Lincoln-Mercury, Inc. (Century) alleging three causes of action, to wit: (1) violation of Unfair Trade Practices Act (UTPA), (2) fraud and deceit and (3) conversion of a check. Century interposed in its answer a general denial and a counterclaim for repairs done on Young's car. At the close of the testimony, the trial judge (1) granted Century's motion for directed verdict on the fraud action, (2) directed verdict for Century for the $6,970.75 representing the amount Young had agreed to pay for car repairs, (3) directed a verdict for Young on her conversion action in the amount of $9,230.11 and submitted the UTPA issue to the jury. The jury found for Young and the judge awarded treble damages and attorney fees. We affirm.

## ISSUES
The only issue of merit is whether the trial judge erred in denying Century's motion for a directed verdict as to the UTPA action.

## FACTS
Young purchased a used 1985 Honda automobile from Century in 1985 for $10,975.00. Fifteen months later she was involved in an automobile wreck in which the other party's insurance carrier (insurance company) acknowledged liability. Young had the car towed to Century, whose employee, Tony

Whitaker, estimated the cost of repair at $6,900.00. The printed estimate provided "occasionally additional damage will be discovered once the work is opened up, and additional repairs will be required." This admonition provided a space for the signature of the customer; Young did not sign it and disavows knowledge of it.

Young, nevertheless, dealt with Whitaker and according to her testimony and with reference to the agreement to repair the car for $6,900.00, Whitaker assured her that when the car was repaired, it would be good as new. Young testified that she asked Whitaker if the car were his, would he fix it and he answered "definitely so."

Young testified that she then asked him "Are you really sure?" And he said, "Yes." According to Young, Whitaker assured her that he could fix anything except a broken heart.

Whitaker told Young that he had talked with the insurance adjuster and the insurance adjuster (Belcher) told Whitaker that Young had the option of totaling the car.

Young told Whitaker that she wanted to think about the situation for a day or so.

Later Young talked with the insurance company adjuster, Belcher, and he offered to pay for the repairs or pay Young $11,500.00 to total the car, the insurance company to keep the wrecked automobile.

Whitaker testified that when an insurance company had agreed to pay Century's bill and when it was discovered that the initial estimate was incorrect and that additional repairs had to be made, it was customary for Century to advise the insurance company of the additional repairs but not to advise the customer. Century's President, Frank Mims, testified that under the circumstances of this case, he believed the company had two customers, i.e., the person who owned the car and the insurance company.

At the time, Young knew nothing about Century's custom of not notifying her about additional repairs; as stated she had been told by Whitaker that they would repair the car "as good as new" and that Whitaker when asked if he could fix the car answered, "definitely so." Under these circumstances, Young decided to have the car repaired.

Century, according to the testimony, was about "50 percent into the repair work" when it discovered additional work was

needed. The additional repairs amounted, according to the record, to $2,340.11, bringing the total repair bill to $9,230.11. Century contacted the insurance company and the additional work was authorized. Importantly, Century did not contact Young before completing the repairs.

When the repairs were complete, Belcher took Century a check for $9,230.11 made payable to Young. Century then told Young the car was ready and cost over $9,300.00 to repair. Young asked Whitaker to itemize the additional repairs, which he did. Young testified that she would not have authorized the repairs had she been told that the cost would be over $6,900.00.

Young went to endorse the check and pick up the car. She took a test drive and Century repaired a steering problem Young noticed. She did not endorse the check. Century contacted her and told her she forgot to sign the check but Young stated she was unable to come at that time.

Later Young met with Century's president, Frank Mims, to complain about how she was treated. Mims sent her to Breakaway Honda and they told her that her car had a retail value of $9,500.00 and that the wholesale value would be around $2,000.00 below that.

Young did not pay the bill and at trial Century still retained the check. Century's answer and counterclaim only alleged that Young refused to endorse the check; it did not allege that no demand had been made for the check although Young's complaint alleged that Century, withheld and continued to withhold plaintiff's check in the amount of $9,230.11, which Century's answer denied. During the trial, Century offered evidence to the effect that no one had asked for the check and then took the inconsistent position that by her actions Young had assigned the check to Century and refused to endorse it.

During Young's case in chief she failed to introduce evidence showing demand for the check. After the close of Century's testimony, Young's attorney moved to open the case so that he could testify that he had mailed a demand for the check to Century's attorney before filing the amended com-

plaint.[1] The trial judge permitted Young's attorney to so testify.

As stated, at the close of the testimony, the trial judge (1) directed a verdict for Century on Young's fraud claim, (2) directed a verdict for Century for $6,970.75 on its counterclaim, (3) directed a verdict for Young for $9,230.11 on her conversion claim and (4) then submitted the UTPA claim and punitive damages for conversion to the jury. The jury awarded Young $3,500.00 on the UTPA claim and found a willful violation. The jury also awarded Young $4,500.00 punitive damages on the conversion claim.

The trial judge trebled the UTPA damages to $10,500.00 and awarded Young $7,352.50 in attorney fees under the UTPA.

At the close of Young's case in chief, Century made a non-suit type motion for a directed verdict on the grounds that Young had offered no evidence to show (1) that there was any unfairness or deceit intended or practiced by Century, and (2) that Young had failed to offer evidence relative to certain key elements of fraud. The trial judge denied these motions. The record discloses that Century failed to make a motion for a directed verdict at the close of the testimony but did make post verdict motions for judgment n.o.v.

## I.

The Unfair Trade Practices Act creates a new substantive cause of action by making unlawful conduct which was not actionable under the common law of torts actionable under the statute. *State ex rel. McLeod v. C & L Corporation, Inc.*, 280 S.C. 519, 313 S.E. (2d) 334 (Ct. App. 1984). The UTPA should be given a liberal construction. *See Paces Ferry Dodge, Inc. v. Thomas*, 174 Ga. App. 642, 331 S.E. (2d) 4 (1985) (interpreting the Georgia Fair Business Practice Act OCGA Section 10-1-391, et seq.).

Section 39-5-20(a), Code of Laws of South Carolina (1976) declares that "unfair methods of competition and unfair or de-

---

[1] The letter from Young's counsel to Century's counsel made demand for the check stating that the demand was made in order to avoid his having to amend the complaint and allege a cause of action for conversion. Young thereafter amended the complaint including the cause of action for conversion.

ceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful.

Section 39-5-140, Code of Laws of South Carolina (1976) provides, inter alia, that a plaintiff in a UTPA action must suffer an ascertainable loss of money, etc., as a result of the use or employment by the defendant of an unfair or deceptive method, act or practice defined by Section 39-5-20. Section 39-5-140(d) provides that a willful violation occurs when the party committing the violation knew of or should have known that his conduct was a violation of Section 39-5-20.

A trade practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is "deceptive" when it has a tendency to deceive. *Harris v. NCNB*, 85 N.C. App. 669, 355 S.E. (2d) 838 (1987).

Whether a particular act or practice is unfair or deceptive within the meaning of the UTPA statute depends upon the facts surrounding the transaction and its impact on the marketplace. *Concrete Service Corp. v. Investors Group, Inc.*, 79 N.C. App. 678, 340 S.E. (2d) 755 (1986), *cert. denied*, 317 N.C. 333, 346 S.E. (2d) 137 (1986).

The Unfair Trade Practices Act should not be construed to increase a plaintiff's burden of proving liability since its purpose is to give additional protection to victims of unfair trade practices, not to make a case harder to prove than it would be under the common law principles. And consistent with this policy, actual knowledge of the principle is not necessary to hold him liable for the acts of his agent committed within the scope of his authority. *State ex rel. McLeod v. C & L Corp. Inc.*, *supra.*

Under Section 39-5-20(a) and (b), Code of Laws of South Carolina (1976, as amended), a plaintiff need not prove the elements of common law deceit in order to establish a violation of the South Carolina Unfair Trade Practices Act since, under the statute, there is no need to show that a claim or representation was intended to deceive but only that it had the capacity, effect, or tendency to deceive. *State ex rel. McLeod v. C & L Corporation*, *supra.*

Even a truthful statement may be deceptive if it has a capacity or tendency to deceive. *Pearce v. American Defender Life Ins. Co.*, 316 N.C. 461, 343 S.E. (2d)

174 (1986).

This court has construed the Act as requiring that an unfair deceptive act or practice in order to be actionable under the UTPA must have an impact upon the public interest and, in effect, that the act and practice must have the potential for repetition. *Noack Enterprises, Inc. v. County Corner Interiors of Hilton Head Island, Inc.*, 290 S.C. 475, 351 S.E. (2d) 347 (Ct. App. 1986).

This court has also held that padding bills for auto repair is an unfair trade practice and effects the public interest because of its potential for repetition. *Barnes v. Jones Chevrolet Co. Inc.*, 292 S.C. 607, 358 S.E. (2d) 156 (Ct. App. 1987).

With the above principles in mind, we have before us a situation in which an automobile dealership, which has a repair shop, acknowledged that it was its custom not to notify the owner of an automobile of repair costs above and beyond the first estimate given to the owner when the bill was to be paid by an insurance company; and further admitted that when it was discovered that a customer's car was damaged far more than originally estimated, it notified its alleged customer, the insurance company, without notifying the owner of the car.

In examining the above-admitted custom and practice, we must take into consideration (1) the facts surrounding this transaction and (2) its impact on the marketplace.

Here we have a situation in which Century's agent assured Young that for $6,900.00 her automobile could be repaired as good as new. It is to be remembered that fifteen months before the wreck, Young had purchased the automobile from Century for $10,975.00. The car at that time was a second-hand car about ten months old and had about 12,000 miles on it. During the fifteen months, Young put about 13,000 miles on the car. When she picked the car up after the wreck, she was told by a Century employee "that car is a real humpty-dumpty to put together again." Ms. Young told the employee "well, maybe you should not have tried so hard." This answer of Young summarizes very well the result of a situation in which she was assured by Century that the car could be repaired "as good as new" for $6,970.75.

Here is a situation in which it is possible that what Century did was not intended to deceive but the jury certainly could

have found that it had the capacity and the effect of deceiving Young let alone having the tendency to deceive. We hold that Century's custom together with the facts and circumstances of this case constituted an unfair trade practice.

We also hold that all of the above has an impact upon the public interest. Century's custom of keeping a car owner in the dark about damages to his car coupled with its custom of conferring with a third party insurance company is highly improper; this custom may lead to collusion and conspiracy on the part of insurance companies and repair shops because both could profit from a transaction such as the one in this case at the expense of the owner of the car and/or the public. We hold that Century's custom has the potential of repetition and that this is self evident.

Finally, there is evidence of record from which the jury could have found that all of the above was made possible by the leverage Century used in keeping the check and refusing to deliver it to Young.

For the above reasons, we hold that the trial judge committed no error in overruling Century's motion for a directed verdict and postjudgment motions.

## II.

### Other Questions

There are other questions presented, but the exceptions upon which the questions are based do not comply with Supreme Court Rule 4, Section 6. The trial bar is admonished to carefully comply with the Supreme Court Rules relating to appellate procedure. The attention of the trial bar is called to the recent case of *Connolly v. People's Life Ins. Co. of South Carolina*, 299 S.C. 348, 384 S.E. (2d) 738 (1989) *rev'g* 294 S.C. 355, 364 S.E. (2d) 475 (Ct. App. 1988), in which the Supreme Court of this state by way of certiorari reviewed a decision of this court and emphatically directed that this court enforce the procedural rules of appeal.

### CONCLUSION

Under the circumstances of this case, we hold that there was no error in the trial judge's refusal to grant Young's motion for a directed verdict and post-verdict motion for a new

trial and judgment n.o.v. We further hold that the remaining questions presented by Century in this appeal did not comply with Supreme Court Rule 4, Section 6, but that even if the questions had been properly presented, this court would have found them to be without merit. The appealed order is therefore affirmed.

Affirmed.

SANDERS, C.J., and CURETON, J., concur.

## ON PETITION FOR REHEARING ORDER

*Per Curiam:*

Opinion No. 1423 was filed in the above case on December 4, 1989. This court granted Century's petition for rehearing on the issue of the conversion claim.

As noted in the decision, the trial judge (1) directed a verdict for Century for $6,970 on its counterclaim and (2) directed a verdict for Young for $9,230.11 on her conversion claim.

Subject to the order granting Century's petition for rehearing on the conversion claim, Century moved to supplement the record pursuant to Supreme Court Rule 8, Section 7. We grant this motion which involves the trial judge's instruction to the jury relating to the conversion cause of action. We quote:

> Now the third cause of action was in conversion, I have directed a verdict for the plaintiff for the conversion of the check, that is I am directing a verdict for actual damages in the amount of the check, *and the defendant will own the check.* [Emphasis ours.]

The record before us reflects the following verdict:

## VERDICT

We find by direction of the Court, we find for the plaintiff on the third cause of action (conversion) nine thousand and two hundred thirty and 11/100 dollars actual damages; for defendant on counterclaim six thousand nine hundred seventy dollars actual damages. As to second cause of action (fraud & deceit) we find for the defendant. Unfair Trade Practice Act—we find for plaintiff thirty-five hundred dollars actual

damages. We further find that the violation was willful. As to third cause of action (conversion) punitive damages, we find for plaintiff forty-five hundred dollars punitive damages.

The record does not disclose that Century made an objection to the form of the verdict. No exception relating to this is taken on appeal.

Until we granted Century's motion to supplement the record which was made after this court's order granting the petition for rehearing on the conversion issue, this court had no way of knowing that the trial judge intended that upon payment of the directed verdict that the defendant would own the check.

The courts of this state have not to our knowledge addressed this issue. For the enlightment of the Bar, we quote from Restatement (Second) of Torts § 222A comment c (1965).

> c. *Recovery of full value of chattel.* The importance of the distinction between trespass to chattels and conversion, which has justified its survival long after the forms of action of trespass and trover have become obsolete, lies in the measure of damages. In trespass the plaintiff may recover for the diminished value of his chattel because of any damage to it, or for the damage to his interest in its possession or use. Usually, although not necessarily, such damages are less than the full value of the chattel itself. In conversion the measure of damages is the full value of the chattel, at the time and place of the tort. *When the defendant satisfies the judgment in the action for conversion, title to the chattel passes to him, so that he is in effect required to buy it at a forced judicial sale.* Conversion is therefore properly limited, and has been limited by the courts, to those serious, major, and important interferences with the right to control the chattel which justify requiring the defendant to pay its full value. [Emphasis ours.]

Of course the above rule is not applicable to the issue before us. The exact issue we deal with was not preserved for appeal by Century. We hold, however, that this court has inherent authority to amend, *ex mero motu,* in the case of a directed verdict, a judgment on appeal when it

appears that the verdict does not conform with the intent of the trial judge in directing the verdict. In directing the verdict for Century for $6,970.75 (the amount of the original estimate) and for Young for $9,230.11, the trial judge obviously considered the insurance check as either so much cash or that upon the payment to Young of the judgment of $9,230.11, Young would endorse the check to Century. Without Young's endorsement of the check, injustice is readily apparent.

In order to effectuate justice in this case, we amend the judgment by ordering that Young endorse the check so that it is payable to Century in order to effectuate the directed verdicts of the trial judge. *See* 5 C.J.S. *Appeal and Error* § 1520 (1958).

The decision heretofore issued in this case is, therefore, amended in the particulars set forth herein.

As to the other grounds contained in the petition for rehearing, this court is unable to discover that any material fact or principle of law has either been overlooked or disregarded.

The decision is amended in the particulars mentioned and in all other respects the petition for rehearing is dismissed.