24330

Danay ADAMS and Helen T. Adams, Appellants v. G.J. CREEL AND SONS, INC., and Paul Creel, Respondents.

(465 S.E. (2d) 84)

Supreme Court

*S. Jahue Moore, Kirkland, Wilson, Moore, Allen, Deneen & Taylor, P.A.*, West Columbia, *for appellants.*

*Clarke W. DuBose, Sinkler & Boyd, P.A.*, Columbia, *for respondents.*

Heard Nov. 2, 1994.

Decided Oct. 16, 1995; Reh. Den. Dec. 19, 1995.

WALLER, Justice:

Appellants Danay and Helen Adams appeal a directed verdict granted to Respondents, G.J. Creel and Sons, Inc. and Paul Creel (Creel). We affirm.

## FACTS

On October 22, 1970, Helen Adams (Adams) entered into a franchise agreement with Gulf Oil Corporation (Gulf) to purchase petroleum products for resale at her service station. The agreement specifically stated that the franchise contract was not assignable by Adams without the written consent of Gulf.

On July 22, 1980, Gulf assigned the franchise contract to Creel. Creel and Adams continued the franchise relationship pursuant to a verbal agreement, the terms of which were the same as those between Gulf and Adams.

On December 31, 1980, Adams attempted to assign one-half interest in the franchise to her son, Danay Adams. In 1982, she attempted to assign her remaining interest.

Creel filed a declaratory judgment action in the Federal Court, seeking to terminate the franchise agreement based upon Adams' breach of the non-assignability clause. Adams filed a counterclaim, alleging breach of contract and violation to the South Carolina Unfair Trade Practices Act (UTPA).[1] She also filed suit in the State Court raising these same allegations.

The Federal Court held that Adams' attempt to assign the franchise to her son constituted a breach of the franchise agreement, justifying Creel's termination of the franchise. The Federal Court dismissed Adams' counterclaims, finding that they should be properly adjudicated in the State Circuit Court. The Circuit Court granted Creel a directed verdict for breach of contract and violation of the UTPA. Adams appeals.

## ISSUES

1. Was Creel entitled to directed verdict on Adams' breach of contract action?

---

[1] S.C. Code Ann. § 39-5-10, *et. seq.* (1985).

2. Did Adams present any evidence that Creel's price for gasoline was unreasonable?
3. Was Creel entitled to directed verdict on Adams' action for violation of the UTPA?

## DISCUSSION

### 1. *Breach of Contract*

Adams contends that Creel breached their contract by failing to sell her gasoline at Creel's lowest price. She argues that this constituted breach of contract accompanied by a fraudulent act and breach of the covenant of good faith and fair dealing. We disagree.

It is well settled that upon review of an order granting a motion for directed verdict, the evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. If only one inference can be drawn from the evidence, the motion must be granted. *Brady Development Co., Inc. v. Town of Hilton Head Island,* 312 S.C. 73, 439 S.E. (2d) 266 (1993).

There exists in every contract an implied covenant of good faith and fair dealing. *Tharpe v. G.E. Moore Co.,* 254 S.C. 196, 174 S.E. (2d) 397 (1970). However, there is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do. *First Federal Savings and Loan Ass'n. of South Carolina v. Dangerfield,* 307 S.C. 260, 414 S.E. (2d) 590 (Ct. App. 1992). Moreover, entering into an agreement, with no intention of keeping such agreement, constitutes fraudulent misrepresentation; however, mere breach of contract does not constitute fraud. *Dailey Co. v. American Institute of Marketing Systems,* 256 S.C. 550, 183 S.E. (2d) 444 (1971).

Here, no evidence was presented to substantiate Adams' contentions of breach of contract. In fact, the testimony of Adams herself established that she and Creel had no agreement as to the price of the gasoline:

QUESTION: In your Complaint, you allege that it was agreed that you would buy at the lowest price charged any other customer.
ANSWER: Yes. Okay. I understand that. Okay.

QUESTION: Was that your agreement with G.J. Creel?

ANSWER: . . . **[T]here was no agreement** and what Mr. Creel, or Paul charged others, you know, that was his doings. Like he has made the statement, he can charge anything he wants to, and he can. So what he charged others and did, I don't know, and what he charged me, I do know.

QUESTION: But as far as your agreement, do I understand your answer to be no, you did not agree with Creel that Creel would charge you as the lowest price charged to any other customer?

ANSWER: No. I mean, **we had no agreement,** because he just charged what he wanted to charge.

QUESTION: Did you ever have any agreement with Creel that it would charge you Gulf's prevailing price?

ANSWER: No. I mean, **we had no agreement.** Like I told you, time and time again, we paid what the ticket said pay.

(Emphasis added.)

Here, by Adams' own admission, the parties had no agreement as to the actual price charged for the gasoline. Rather, the parties agreed that Creel would honor the same terms and conditions that Adams had with Gulf. The record shows that Creel charged Adams the "dealer tankwagon" price for gasoline. This was the same price Gulf charged Adams under their former contract. This was also the same price charged by Creel to the other similarly situated station it serviced. Although Adams presented evidence that other Creel customers[2] were charged lower prices for Gasoline, she failed to present any evidence that Creel breached their contract or that Creel acted unfairly or fraudulently. Accordingly, we find directed verdict was properly granted on Adams' breach of contract actions.

### 2. *Violation of S.C. Code Ann. § 36-2-305*

Adams also contends that she was entitled to have the jury decide whether the price charged by Creels was unreasonable and, therefore, in violation of S.C. Code

---

[2] Consignment customers and private retail customers were charged a lower price than Adams. However, it is undisputed that these customers had a different contractual relationship with Creel. There was only one comparable service station in the area, and Creel charged this station the same "dealer tankwagon" price for gasoline as it did Adams.

Ann. § 36-2-305 (1977). We disagree.

S.C. Code Ann. § 36-2-305 provides that when parties have an open price contract, the price charged by the seller must be reasonable and fixed in good faith. As noted above, Adams failed to present any evidence that the price charged by Creel was in violation of their contract or unreasonable. Rather, she was charged the "dealer tankwagon" price for gasoline by Creel throughout the course of their franchise relationship, just as she had been charged by Gulf. This was the same price charged by Creel to the other similarly situated station it serviced.

We find no evidence presented by Adams to support her contention that the price charged by Adams was unreasonable. Although the question of reasonableness is generally a question for the jury, Adams failed to sustain the initial burden of setting forth sufficient facts to establish a jury question. *Brady Development Co., supra.*

### 3. *Unfair Trade Practices*

Adams alleged that the disparity between the prices she was charged for gasoline and the prices charged by Creel to its other customers constituted a violation of the UTPA. The Trial Court granted Creel a directed verdict on this cause of action, holding that Adams failed to present any evidence of unfair or deceptive acts. We agree.

The SCUTPA provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C. Code Ann. § 39-5-20 (1985).

"A trade practice is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is deceptive when it has a tendency to deceive." *Young v. Century Lincoln-Mercury*, 302 S.C. 320, 326, 396 S.E. (2d) 105, 108 (Ct. App. 1989).

Here, Adams merely presented evidence that Creel charged less for gasoline to retail end users and to consignment customers. As noted above, although Adams and Creel had no agreement as to the price she was charged for gasoline, Creel charged her the "dealer tankwagon" price, just as Gulf has charged. This was the same price charged to the other similarly situated customer of Creel. Further, Adams made the determination of what price to charge her customers

for gasoline.[3] There is no evidence that Creel was engaged in price fixing.

We find no evidence that the price set by Creel was immoral, unethical, oppressive, or deceptive. Accordingly, we find that the Trial Court properly directed a verdict in favor of Creel on the unfair trade practice claim.

Affirmed.

CHANDLER, C.J., and FINNEY and MOORE, JJ., concur.

TOAL, J., dissents in separate opinion.

TOAL, Justice, dissenting:

I respectfully dissent believing that this matter should have been submitted to a jury. The basis for this dispute is plaintiff's contention that Creel used illegal gasoline pricing policies to try to drive Adams out of business.

From 1967-1980, when Adams was a Gulf franchisee, Gulf did not operate its own stations in Horry County. As a franchisee, Adams was sold gasoline by Gulf at the "dealer tankwagon" price, which was more favorable than the price Gulf charged the non-franchisee stations it supplied. In 1980, Creel bought the Adams station property and supply contract from Gulf. Although Creel told Mrs. Adams everything would be the same as it was under Gulf, Creel began to sell gasoline to other stations in the same market for 14 cents to 22 cents a gallon lower than the "dealer tankwagon" price it charged adams. Adams claimed that Creel was using a policy of pricing below wholesale to drive them out of business so Creel could obtain control of the station.

1. *Breach of Contract*

In my view, the plaintiff was entitled to submit to the jury its claim that the systematic price advantage Creel gave its other customers was a breach of the implied covenant of good faith and fair dealing and thus a breach of Creel's contract with Adams. In *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed. (2d) 492 (1990), the United States Supreme Court held that such arrangements are illegal; *See*

---

[3] Creel presented evidence that Adams marked up the gasoline as much as forty cents per gallon.

*also Barnes v. Gulf Oil*, 795 F. (2d) 358 (4th Cir. 1986) (holding that a franchisor cannot justify illegal pricing by hiding behind the "letter" of its contract); Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv. L. Rev. 368 (1980) (seller's performance of contractual duties in good faith encompasses more than "letter" of contract, also includes expectations of parties regarding pricing).

2. *Violation of UCC Requirements of Seller's Reasonableness and Good Faith in Open Price Contract, S.C. Code Ann. § 36-2-305*

The contract between these parties was an open price contract. A jury should have been allowed to decide whether the "dealer tankwagon" price charged Adams was reasonable in light of the lower prices charged to other dealers by Creel. There is conflicting evidence on this point which the majority simply dismisses on the basis that the other stations were not "similarly situated." This is for a jury to decide. The *South Carolina Reporter's Comments* to § 36-2-305 emphasize that once it is established that an open price contract exists, reasonableness and good faith are each jury questions. The evidence of Creel's pricing to other customers as well as expert testimony is ignored by the majority opinion.

3. *Unfair Trade Practices*

We have held that South Carolina's Unfair Trade Practices Act (UTPA) is applicable to price discrimination claims. *Jackson v. Atlantic Soft Drink Co.*, 286 S.C. 577, 336 S.E. (2d) 13 (1985). Plaintiff claims that the disparate prices Creel charged its various stations constituted illegal pricing under state common law, the state Uniform Commercial Code, the state's UTPA and under the federal Petroleum Marketing Practices Act. Price fixing is one of the very practices the Unfair Trade Practices Act was intended to address. *See* Richard E. Day, *South Carolina Unfair Trade Practices Act: Sleeping Giant or Illusive Panacea,* 33 S.C. L. Rev. 479 (1982). The majority sidesteps the issue of whether an allegation of price fixing is an allegation of an unfair trade practice by using the definition of unfair trade practice found in *Young v. Century Lincoln-Mercury*, 302 S.C. 320, 396 S.E. (2d) 105 (Ct. App. 1989). This case holds that a claim against an auto

repair shop for padding repair bills is cognizable under UTPA as a deceitful unfair trade practice. This case does not exclude from the definition of unfair trade practice alleged illegal practices such as price fixing.

The majority contends that the evidence is undisputed that 1) there was no agreement between Creel and Adams as to price, and 2) Adams was charged the "dealer tankwagon" price the same as other similarly situated customers of Creel. I disagree that this is the undisputed evidence, but even if it were, Adam's claim is based on *disparity* of pricing between various customers of Creel. As briefly outlined above, in the present status of the law, when franchisor undercuts prices to drive out a franchisee as alleged here, such practice is illegal, is violative of public policy and, thus, claims based thereon are cognizable under the South Carolina Unfair Trade Practices Act. This is the basis of plaintiff's unfair trade practices claim. I would allow a jury to decide whether plaintiff has proved it.

I would reverse.