THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED 
 ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR. 
 
THE STATE OF SOUTH CAROLINA
 In The Supreme Court

 
 
 
 
 
 Thermal Engineering Corp. Respondent/Appellant,
 
 
 

v.
 
 
 
 
 Rasmussen Iron Works, Inc.; Southeastern Marketing Group, LLC;  Timothy 
 K. Wood; Vari-Fuel Specialty Products, Inc.; Gary C. Freeland; Champion 
 Marketing Group, Inc; and John E. Pell, Jr. Defendants,
 of whom Rasmussen Iron Works, Inc.; Southeastern Marketing Group, LLC; 
 Vari-Fuel Specialty Products, Inc.; and Champion Marketing Group, Inc., 
 are Appellants/Respondents.
 
 
 

Appeal From Richland County
 G. Thomas Cooper, Jr., Circuit Court Judge

Memorandum Opinion No. 2004-MO-050
 Heard March 17, 2004  Filed September 15, 2004

REVERSED

 
 
 
 
 Robert Y. Knowlton, Franklin H. Turner, III, and B. Eric Shytle of 
 Haynsworth Sinkler Boyd, PA, of Columbia, for Appellant/  Respondent 
 Rasmussen Iron Works, Inc.
 Frank R. Ellerbe, III, and Bonnie D. Shealy of Robinson, McFadden & 
 Moore, PC, of Columbia, for Appellants/Respondents Southeastern Marketing 
 Group, LLC, Vari-Fuel Specialty Products, Inc., and Champion Marketing 
 Group, Inc.
 W. Duvall Spruill of Turner, Padget, Graham & Laney, P.A., of Columbia, 
 for Respondent/Appellant Thermal Engineering Corp.
 
 
 

JUSTICE BURNETT:  Thermal Engineering Corp. (TEC) brought breach of 
 contract, unfair trade practice, and related actions against Rasmussen Iron 
 Works, Inc. (Rasmussen); Southeastern Marketing Group, LLC (Southeastern); Vari-Fuel 
 Specialty Products, Inc. (Vari-Fuel); and Champion Marketing Group (Champion).  
 The jury returned verdicts against all defendants.
Rasmussen appealed.  Southeastern, Vari-Fuel, and Champion jointly appealed.  
 TEC cross-appealed.  The three appeals were consolidated for review pursuant 
 to Rule 214, SCACR.  We reverse.
FACTS
TEC, a manufacturer of infrared gas barbecue grills based in Columbia, markets 
 its grills primarily through independent dealer representatives who sell them 
 to specialty retailers in the United States.   TEC entered into a contract in 
 May 1999 with Rasmussen, a California manufacturer of gas logs.  The contract, 
 drafted by TEC, originally granted Rasmussen the exclusive right to distribute 
 TEC grills in California and later was expanded to include Arizona and Nevada.  
 The contract stated Rasmussen would use its best efforts to distribute the 
 TEC grill and diligently promote its sale to dealers and other retailers in 
 California.  The contract further provided that [Rasmussen] will handle no 
 other consumer gas grills for which the manufacturers suggested retail prices 
 for the highest priced unit exceed 70 percent of the suggested retail for TECs 
 lower priced unit.
TECs three primary dealer representatives in 1999-2000 were Southeastern, 
 Vari-Fuel, and Champion (collectively, the Representatives).  Each essentially 
 was a one-person company serving designated regions of the United States:  Tim 
 Wood at Southeastern, Gary Freeland at Vari-Fuel, and John Pell at Champion.  
 The sale of TEC grills accounted for the majority of each representatives business 
 in 1999-2000, and together the three representatives accounted for half of TECs 
 annual grill sales.  
Each dealer representative in January 2000 signed an eighteen-month contract, 
 drafted by TEC, which stated the representative will do all things reasonable, 
 necessary, and appropriate to maximize sales of TECs Infra-red Gas Grill line.  
 Each contract set forth expected sales goals in specified territories, which 
 the representative was committed to achieving . . . at a minimum.  Each contract 
 further stated the representative is free to handle other products or lines. 

TEC alleged at trial that from March to September 2000, Rasmussen took various 
 steps to secretly develop and begin manufacturing its own new grill to compete 
 with TECs grill; that  Rasmussen solicited and met with Wood, Freeland, and 
 Pell to recruit them to sell Rasmussens grill; and that Wood, Freeland, and 
 Pell actively participated in the planning and development of Rasmussens grill.  
 The events were described primarily through the testimony of Ted and Rett Rasmussen, 
 Jim Griffin, Wood, Freeland, and Pell, all of whom are principals and managers 
 of the defendant companies.
TEC first heard of Rasmussens new grill in August 2000.  Rasmussen owners 
 and managers, Wood, Freeland, and Pell did not inform TEC of the planning, development, 
 and expected manufacture of Rasmussens new grill.  TEC terminated the contract 
 by giving a six-month notice of termination to Rasmussen as allowed by the contract.  
 Rasmussen, in response, agreed to an immediate termination of the contract in 
 September 2000. [1]   TEC terminated 
 its contracts with Wood, Freeland, and Pell soon afterward.  No Rasmussen grills 
 were sold or distributed until after the contracts were terminated.
TEC contends the contracts prohibited Rasmussen and the Representatives from 
 developing or handling Rasmussens new grill.  The actions of Rasmussen and 
 the Representatives were in direct violation of the parties contracts and constituted 
 deceptive, unfair, and intolerable tactics under the South Carolina Unfair Trade 
 Practices Act (UTPA). [2] 
Rasmussen and the Representatives each denied breaching their respective contracts 
 with TEC, testifying they continued to use their best efforts to promote and 
 sell the TEC grill even while preparing and discussing Rasmussens grill.  Their 
 primary defenses were that no breach of contract or unfair trade practice had 
 occurred; the contracts did not prohibit them from developing or handling a 
 competing grill; all were separate companies and everything that occurred was 
 done in the name of competition and free enterprise; TECs change in marketing 
 efforts did not bode well for the future; and any lack of sales of TEC grills 
 in 2000 was attributable TECs shipping and quality problems, an economic downturn, 
 and increasing competition from other grill makers.  Rasmussen presented evidence 
 sales of TEC grills increased in California after it became a distributor.
TECs chief financial officer David OKelly, qualified as an expert on corporate 
 financial records, explained the method he used to determine expected sales 
 goals for each defendant, as well as the formula he used to calculate lost profits.  
 The sales goals were the bases of TECs alleged damages.  TEC alleged lost profits 
 in 2000 due to Rasmussens, Southeasterns, Vari-Fuels and Champions respective 
 breaches of contract.
The jury returned verdicts against Rasmussen for breach of contract and violation 
 of the South Carolina Unfair Trade Practices Act; and against Southeastern, 
 Vari-Fuel, and Champion for breach of contract and breach of contract accompanied 
 by a fraudulent act.
LAW / ANALYSIS
Rasmussen and the Representatives each challenge the trial courts rulings 
 relating to issues of liability and damages.  We find it necessary to address 
 only the liability issue:
 
 
 Rasmussen:  Did the trial court err in rejecting Rasmussens argument that 
 as a matter of law TEC failed to prove a breach of contract because the 
 contract allowed Rasmussen to engage in the above-described acts without 
 violating the prohibition on handling a competing grill?
 The Representatives:  Did the trial court err in rejecting the Representatives 
 argument that as a matter of law TEC failed to prove a breach of contract 
 because their contracts, which stated they were free to handle other products 
 or lines, allowed them to engage in the above-described acts?
 

Rasmussen and the Representatives both contend the trial court erred in not 
 ruling as a matter of law that the definition of handle, as used in their 
 respective contracts, is limited to selling or distributing a competing grill, 
 not planning or developing a competing grill.  We agree.
We conclude under the facts and circumstances presented in this case the term 
 handle, as used in the respective contracts, is not ambiguous.  Therefore, 
 the trial court erred in not ruling as a matter of law that handle means sell 
 or distribute.  See South Carolina Dept of Natural Resources v. 
 Town of McClellanville, 345 S.C. 617, 550 S.E.2d 299 (2001) (whether contract 
 is ambiguous initially is question of law for the court); Conner v. Alvarez, 
 285 S.C. 97, 328 S.E.2d 334 (1985) (when contract is plain and capable of legal 
 construction, the language itself determines the full force and effect of the 
 document); Myrtle Beach Lumber Co., Inc. v. Willoughby, 276 S.C. 3, 274 
 S.E.2d 423 (1981) (any ambiguity in written contract should be construed liberally 
 and most strongly in favor of the party who did not write or prepare the contract 
 and is not responsible for its ambiguity; any uncertainty as to its meaning 
 should be resolved against the party who prepared the contract or is responsible 
 for its wording).
Rasmussen in its contract agreed not to handle, i.e., sell or distribute, 
 a competing grill, but remained free to plan and develop its own grill.  The 
 Representatives contracts are drafted more broadly, affirmatively providing 
 they were free to handle other products or lines.  Thus, the Representatives 
 were free to assist in the planning and development of Rasmussens new grill 
 while distributing TECs grill. These provisions allowed both Rasmussen and 
 the Representatives to engage in the above-described acts without breaching 
 their respective contracts with TEC.
The contracts did not prohibit Rasmussen and the Representatives from engaging 
 in preparatory acts necessary to develop a competing gas grill in the future.  
 Rasmussen and the Representatives did not promote, market, sell, or distribute 
 Rasmussens new grill to the public until after the termination of their contracts 
 with TEC; therefore, none of the defendant companies breached their contracts.
With regard to Rasmussens contract, this interpretation of the term handle 
 is further buttressed by the fact the contract specifically focused on retail 
 price levels by prohibiting Rasmussen from handling consumer gas grills for 
 which the suggested retail prices for the highest priced unit exceed 70 percent 
 of the suggested retail for TECs lowest priced unit.  The focus on price indicates 
 the parties intended for this clause to prevent Rasmussen from selling or distributing 
 competing gas grills, not from planning the development and manufacture of a 
 grill that might be sold in the future when Rasmussen would be contractually 
 free to do so.
Our resolution of this liability issue necessarily means the other causes of 
 actions asserted by TEC must fail.  If the Representatives did not commit a 
 breach of contract, they cannot be found to have committed a breach of contract 
 accompanied by a fraudulent act.  Similarly, if the above-described acts were 
 allowed under the parties contracts, those same acts in this instance cannot 
 be deemed to constitute unfair or deceptive acts under the UTPA.  We do not 
 conclude that in every case a UTPA action must fail when an accompanying breach 
 of contract action fails.  However, such a conclusion is appropriate under the 
 facts and circumstances presented in this case.
Chief Justice Toal, dissenting, agrees the Representatives did not breach their 
 contract with TEC under the plain terms of the contract.  The chief justice 
 believes Rasmussen, by its actions, breached the implied covenant of good faith 
 and fair dealing contained in every contract and would uphold damages awarded 
 against it.  We certainly agree this covenant is an inherent part of every contract, 
 regardless of whether it is explicitly set forth or embraced by the parties 
 in a written document or verbal agreement.  See Adams v. G.J. Creel 
 and Sons, Inc., 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995) ([t]here exists 
 in every contract an implied covenant of good faith and fair dealing); Tharpe 
 v. G.E. Moore Co., 254 S.C. 196, 174 S.E.2d 397 (1970) (same).  However, 
 there is no breach of an implied covenant of good faith where a party to a contract 
 has done what provisions of the contract expressly gave him the right to do.  
 Adams, 320 S.C. at 277, 465 S.E.2d at 85.  Under the facts of this case, 
 we do not believe the implied covenant should apply in a manner that defeats 
 the proper interpretation of an important contractual term.  Rasmussen acted 
 in good faith and dealt fairly with TEC by refraining from selling or distributing 
 its competing grill, as required by its contract, until termination of that 
 contract.  See also RoTec Services, Inc. v. Encompass Services, Inc., 
 359 S.C. 467, 597  S.E.2d 881 (Ct. App. 2004) (implied covenant of good faith 
 and fair dealing is not an independent cause of action separate from the claim 
 for breach of contract).
CONCLUSION
We conclude that neither Rasmussen nor the Representatives breached their respective 
 contracts with TEC.  This result makes it unnecessary to address the remaining 
 issues presented by Rasmussen, the Representatives, or TEC.  We reverse the 
 jurys verdict and remand this matter to the circuit court for entry of judgment 
 in accordance with this opinion.
REVERSED.
WALLER and PLEICONES, JJ., concur.  TOAL, C.J., dissenting in a separate 
 opinion in which MOORE, J., concurs.

 
CHIEF JUSTICE TOAL: I agree with the majority 
 that the Representatives -- Southeastern Marketing Group, LLC, Vari-Fuel Specialty 
 Products, Inc., and Champion Marketing Group -- did not breach their contract 
 with TEC because the contractual provision stating that the Representatives 
 were free to handle other products or lines did not prohibit the Representatives 
 conduct in question.  
I disagree with the majoritys conclusion that 
 Rasmussen did not breach its exclusive distributorship contract with TEC.  As 
 TECs exclusive distributor for California, Rasmussen was contractually forbidden 
 to concurrently and surreptitiously design, construct, test, and contract with 
 a third party to produce its own high-end, infrared grill.  This activity constituted 
 a clear breach of the covenant of good faith and fair dealing that is embedded 
 in every contract.  Since I would find Rasmussen in breach of its exclusive 
 distributorship contract with TEC, I would affirm the damages verdict as to 
 Rasmussen only.  I respectfully dissent.   
Factual Background
TEC manufactures high-end infrared grills, which sell for a minimum retail 
 price of $1,500.  TECs grill heats food using infrared radiation, which is 
 energy efficient and does not dry out food as rapidly as a convection or conduction 
 grill. [3]    
In May 1999, Rasmussens president and his son came to Columbia to express 
 their interest in distributing TECs infrared grill in California. [4]    As a result of the meeting, 
 TEC and Rasmussen entered into the exclusive distributor agreement covering 
 the state of California. 
The Exclusive Distributorship Contract
The Rasmussen-TEC agreement contains various key provisions:
 
 
 (1) Rasmussen is to become the wholesale distributor of TECs consumer 
 Infra-red gas grills, accessories and replacement parts for the state of 
 California.
 (2) Rasmussen will then be the sole distributor for the wholesale distribution 
 of the grills in California.  [Rasmussen] will use its best efforts to develop 
 a retail dealership system within the state for the sale of TEC grills.
 (3) In accepting the benefits and the responsibilities of being the exclusive 
 wholesale distributor for the grills, [Rasmussen] understands that there 
 are some limits beyond which TEC may not go in limiting dealers or distributors 
 from outside the state of California from sending grills into the state.  
 
 (4) Rasmussen will diligently promote the sale of TEC Consumer grills 
 and accessories.
 (5) Rasmussen will handle no other consumer gas grills for which 
 the manufacturers suggested retail prices for the highest price unit exceed 
 70 percent of the suggested retail for TECs lowest priced unit.
 (6)  The prices at which Consumer grills and related components will be 
 sold to Distributor will be 48.95 percent of the suggested retail price 
 published by TEC from time to time.
 (7)  This Agreement will terminate six months after either party gives 
 to the other party written notice of a desire to terminate this Agreement, 
 or if both parties agree in writing.
 

(emphasis added).  Under this agreement, Rasmussen obtained 
 two major benefits: (1) the exclusive right to distribute high-end, TEC infrared 
 grills in California and (2) the right to purchase the grills at less than 50% 
 of the retail price.  In return, Rasmussen agreed to (1) diligently promote 
 the infrared grills, (2) use its best efforts to establish a retail dealership 
 network within California, and (3) refrain from handling other high-end consumer 
 gas grills.  
Within the first four months of signing the contract, Rasmussen ordered $400,000 
 worth of TEC grills, but soon thereafter, Rasmussens purchases dissipated.  

At a Baltimore trade show in March 2000, Rasmussen approached 
 ESP-2000, a California manufacturer, to discuss ESP-2000s interest in manufacturing 
 a high-end, infrared grill. [5]   Rasmussen and ESP-2000 had a follow-up meeting in California, 
 and by May 2000, they had a working prototype of the new infrared grill. 
 [6]   One month later, the two parties signed a contract whereby ESP-2000 
 would manufacture up to 6,000 high-end, infrared grills per year for $200,000.  

Concurrently, Rasmussen contacted the three TEC Representatives to discuss 
 whether they would be interested in selling Rasmussens new grill, and in July 
 2000, the Representatives went to California for a two-day meeting where they 
 tested the grill, suggested improvements for the grill, and developed marketing 
 and pricing strategies for the grill.
TEC first heard rumors of Rasmussens Solaire grill in August 2000, and on 
 September 8, 2000, TEC and Rasmussen mutually agreed to terminate the exclusive 
 distributorship agreement. [7]   

Law/Analysis
[E]very contract contains an implied obligation of good faith and fair dealing 
 in its performance and enforcement.  Arthur L. Corbin, Corbin on 
 Contracts vol. 2 § 5.27, 139 (Rev. ed., West 1995) (emphasis added); see 
 e.g. Charleston Dry Cleaners & Laundry, Inc. v. Zurich American Ins. 
 Co., 355 S.C. 614, 617-618, 586 S.E.2d 586, 588 (2003) (recognizing that 
 an insurer owes the insured the duty of good faith and fair dealing, which arises 
 from the insurance contract). 
 
 
 The duty [of good faith and fair dealing] embraces, among other things, 
 an implied obligation that neither party shall do anything to injure or 
 destroy the right of the other party to receive the benefits of the agreement.  
 
 
 [A] party who evades the spirit of the contract, willfully renders imperfect 
 performance, or interferes with performance by the other party,  may be 
 liable for breach of the implied obligation of good faith and fair dealing. 
 
 

Samuel Williston, A Treatise on the Law of Contracts 
 vol. 23 § 63:22, 506-508 (4th ed., West 2003) (citation omitted).
Rasmussens surreptitious efforts to develop, test, market, 
 and most importantly, contract with a third party to build 6,000 high-end, 
 infrared grills, while under an exclusive distributorship agreement to promote 
 a competing product, violate the spirit of the contract and clearly breach 
 the covenant of good faith and fair dealing.  Rasmussens calculated plan to 
 roll out 6,000 units of the high-end grill completely interferes with the contractual 
 benefit that TEC was entitled to: an exclusive distributors diligent effort 
 to promote TECs infrared grill. [8]   
Accordingly, I would find Rasmussen in breach of the exclusive 
 dealership contract and would affirm the judgment of damages against Rasmussen 
 only. 
MOORE, J., concurs.

 
 [1]   TEC, in a letter dated August 24, 2000, notified Rasmussen 
 it was giving a six-month notice of termination as allowed in the parties 
 contract and offered to negotiate an earlier termination date.  Rasmussen, 
 in a letter dated September 8, 2000, agreed to terminate the contract immediately.  
 Neither party explicitly reserved or abandoned any rights relating to alleged 
 breaches of contract prior to the termination date.

 
 [2]   S.C. Code Ann. §§ 39-5-10 to -170 (1985 & Supp. 2003).

 
 
 [3] A convection grill or oven cooks the food by heating the air around 
 it, while a conduction grill cooks the food by heating an object, like an 
 iron skillet.

 
 
 [4] Rasmussens primary business was manufacturing gas logs for gas fireplaces.

 
 
 [5] TECs patent on the infrared grill technology was to expire in April 
 2000.  

 
 
 [6] TECs national sales manager met with Rasmussen in May 2000, and 
 asked whether Rasmussen had considered producing its own grill.  Rasmussen 
 denied having any such intention and gave reasons why they would not pursue 
 that option.

 
 
 [7] The contract provided that either party could terminate the agreement 
 after giving six-months written notice or by mutual agreement.  On August 
 24, 2000, TEC wrote Rasmussen, giving the requisite six-month termination 
 notice and urging a more immediate, mutual termination.  Rasmussen responded 
 on September 8, 2000, giving its consent to terminate the agreement effective 
 that day.
 TECs August 24 letter giving notice of termination gave lack of interest 
 and lack of sales by Rasmussen as justification for termination.  While TECs 
 CEO testified that by the time this letter was written, he had been told that 
 Rasmussen was working on an infrared grill, the August 24 letter gave no indication 
 that TEC was terminating the agreement because of Rasmussens efforts to promote 
 its own grill.

 
 
 [8] I respectfully disagree with the majoritys decision to hinge its 
 entire decision on the meaning of one word -- handle -- and give it a definition 
 -- sell or distribute -- in concluding that Rasmussens efforts to bring 
 its own infrared grill to market did not breach the exclusive distributorship 
 contract with TEC.  The spirit of the TEC-Rasmussen exclusive distributorship 
 agreement was much broader than the single contractual provision upon which 
 the majority relies, and included, among others, the implied covenant of good 
 faith and fair dealing.