**THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Quarter Pointe Ventures, LLC, Respondent,

v.

James Lineberger, Appellant.

Appellate Case No. 2016-002060

———————

Appeal From York County
S. Jackson Kimball, III, Master-in-Equity

———————

Unpublished Opinion No. 2019-UP-206
Heard March 12, 2019 – Filed June 5, 2019

———————

**AFFIRMED IN PART AND REVERSED IN PART**

———————

William Mark White and Jeremy Daniel Melville, both of Spencer & Spencer, PA, of Rock Hill, for Appellant.

Matthew Elliott Cox, of Matthew E. Cox, LLC, of Columbia, for Respondent.

———————

**PER CURIAM:**  In this declaratory judgment action, James Lineberger appeals the master-in-equity's order, arguing the master erred in (1) finding Quarter Pointe Ventures, LLC (QPV) had not breached the covenant of good faith and fair dealing, misapplying the business judgment rule, and limiting his right to

additional compensation; (2) finding the fair market value of the land did not exceed $1 million; (3) attributing a value to the right-of-way area and limiting his right to additional compensation for the right-of-way; (4) ordering he file a satisfaction of mortgage where obligations secured by the mortgage remain outstanding; and (5) suspending accrual of interest under the note. We affirm in part and reverse in part.

**FACTS**

QPV was a South Carolina limited liability company formed by Lineberger, Christopher R. Barton, Meverell L. Pence, Jr., and Roger L. Pence. QPV owned a 24-acre tract of land in York County. In 2012, York County took by eminent domain approximately eight acres of the tract for the construction of the Fort Mill Southern Bypass. This left QPV with a 14-acre southern lot (Large Tract), a 1.6-acre northern lot (Small Tract), and potential rights to small strips of land near the bypass, which York County might abandon, totaling slightly less than one acre (ROW). On June 6, 2014, QPV listed the Small Tract for sale with an asking price of $1.2 million. On March 17, 2015, QPV sold the Large Tract for $2.6 million to Doby's Bridge Investor's, LLC, (DBI), and Lineberger and QPV entered into a buyout agreement. DBI is jointly owned by QPV and MPV Properties, LLC (MPV). The buyout agreement stipulated Lineberger was to receive $320,000 cash from the sale of the Large Tract and a promissory note for $395,000, secured by a first priority mortgage "encumbering the [Small Tract]." The buyout agreement further stated Lineberger would be entitled to 25% of the net profits in excess of $1 million from the sale of the Small Tract if sold for over $1 million, 25% of the net profits from the sale of the ROW, and 10% interest accruing on the principal of the note. The promissory note evidenced a debt of $395,000, incorporated the buyout agreement, and stated failure under the buyout agreement constituted an event of default. The mortgage secured the note's principle debt of $395,000 and stated "[t]he obligations secured by this Mortgage . . . are as follows: Payment of all indebtedness[,] . . . performance of all obligations of Mortgagor under the Note[,] . . . and performance of all obligations under the Membership Buyout Agreement." The mortgage secured these obligations against the Small Tract only.

On March 24, 2015, QPV received an offer of $1.1 million from Durban Acquisitions (Durban) for the Small Tract. QPV rejected this offer because Durban's offer would have taken nine months to complete, and Durban develops grocery stores, which conflicts with DBI's use of the Large Tract. QPV admitted the Small Tract could be sold for more than $1 million. In August 2015, QPV and MPV formed a second LLC—DB2 Associates (DB2)—each with a 50% share of

the company.  QPV then contracted to sell the Small Tract to DB2 for $1 million, with DB2 and QPV each supplying $500,000 for the sale.  In the same transaction, QPV contracted to transfer rights to the ROW, if abandoned, to DB2 for a total capital commitment of $209,316—$104,658 from each company.  DB2's operating agreement stated if the ROW is abandoned before July 31, 2018, MPV will contribute $104,658; however, if abandoned after July 31, 2018 "unencumbered fee simple title of [the ROW] will be transferred to [QPV]."  QPV intended to use the money received from the sale of the Small Tract to satisfy Lineberger's promissory note.  QPV requested Lineberger execute a satisfaction of mortgage to be held in trust for QPV's payment of the note; however, Lineberger refused because the mortgage secured his interest in the ROW.  QPV was unable to close on the Small Tract because the mortgage remained on the property.

QPV brought a declaratory judgement requesting that Lineberger be dissociated from QPV and requiring him to accept the payoff of the mortgage.  A hearing was held before the master-in-equity on April 14, 2016.  Lineberger stated he thought the fair market value of the Small Tract was between $1.4 million to $1.6 million.  The master-in-equity found $1 million was the fair market value of the property and Lineberger could no longer control to whom QPV sold the Small Tract.  The master ordered that: (1) QPV is entitled to sell the Small Tract to DB2 for $1 million; (2) Lineberger shall execute a satisfaction of mortgage and notice of dissociation; (3) QPV shall satisfy the note with interest abating August 15, 2015; (4) if the ROW is abandoned before July 31, 2018, QPV shall pay Lineberger $52,329; and (5) if the ROW is abandoned after July 31, 2018, QPV shall pay 25% of any money recognized thereafter.  This appeal follows.

**STANDARD OF REVIEW**

"In order to determine the appropriate standard of review to apply in an appeal from a declaratory judgment action, this court must look to the nature of the underlying action." *Consignment Sales, LLC v. Tucker Oil Co.*, 391 S.C. 266, 273-74, 705 S.E.2d 73, 77 (Ct. App. 2010).  "Whether an action for declaratory relief is legal or equitable in nature depends on the plaintiff's main purpose in bringing the action." *Williams v. Wilson*, 349 S.C. 336, 340, 563 S.E.2d 320, 322 (2002).  Generally, "the essential character of the cause of action, and the remedy or relief it seeks, as shown by the allegations of the complaint, determine whether a particular action is at law or in equity, unaffected by the conclusions of the pleader or by what the pleader calls it, or the prayer for relief." *Bell v. Mackey*, 191 S.C. 105, 3 S.E.2d 816, 822 (1939).  Here, QPV sought a declaratory judgment ordering Lineberger to provide satisfaction of a mortgage, sign a notice of dissociation, and

suspend interest on the note; thus, the main purpose of QPV's action was affirmative equitable relief.  *See Doe v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 347 S.C. 642, 645-46, 557 S.E.2d 670, 672 (2001) (providing declaratory action was equitable where main purpose was to enjoin a party); *Shelley v. S.C. Dep't of Mental Health*, 283 S.C. 344, 346, 322 S.E.2d 687, 689 (Ct. App. 1984) (holding a declaratory action for the dissolution of the lien is an equitable action).

"In an action in equity referred to a master, the appellate court may view the evidence to determine facts in accordance with its own view of the preponderance of the evidence, though it is not required to disregard the findings of the master." *Keane v. Lowcountry Pediatrics, P.A.*, 372 S.C. 136, 143, 641 S.E.2d 53, 57 (Ct. App. 2007).  In a proceeding in equity, "[a]ppellants have the burden of convincing this court the trial court committed error.  Additionally, this court may affirm the trial court's ruling upon any ground appearing in the record." *Greer v. Spartanburg Tech. Coll.*, 338 S.C. 76, 79-80, 524 S.E.2d 856, 858 (Ct. App. 1999) (citation omitted).

## LAW/ANALYSIS

## I.      Good Faith and Sale of Small Tract and ROW

Lineberger argues the master erred by not holding QPV violated the implied covenant of good faith and fair dealing by finding a 50% sale of the Small Tract and the ROW was sufficient to determine his compensation under the buyout agreement.  We disagree.

"There exists in every contract an implied covenant of good faith and fair dealing." *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995).  "Since its application in this state, South Carolina appellate courts have consistently given credence to the underlying purpose of the doctrine of good faith and fair dealing by using it to protect the intentions of the parties to the contract." *Williams v. Riedman*, 339 S.C. 251, 273, 529 S.E.2d 28, 39 (Ct. App. 2000).  "[T]he implied covenant of good faith and fair dealing has been viewed as another contract term." *Id.* at 274, 529 S.E.2d at 40.  "In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made." *Riedman*, 339 S.C. at 273, 529 S.E.2d at 39 (quoting *Commercial Credit Corp. v. Nelson Motors, Inc.*, 247 S.C. 360, 367, 147 S.E.2d 481, 484 (1966)).

"[T]here is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do." *Adams*, 320 S.C. at 277, 465 S.E.2d at 85 (holding where an agreement on terms and conditions did not specify a price, seller had the right to charge what seller determined was fair without violating the implied covenant of good faith and fair dealing); s*ee First Fed. Sav. & Loan Ass'n of S.C. v. Dangerfield*, 307 S.C. 260, 267, 414 S.E.2d 590, 594 (Ct. App. 1992) (holding a bank seeking payment from guarantors without first safeguarding and pursuing collateral did not violate the contract); *Hotel & Motel Holdings, LLC v. BJC Enterprises, LLC*, 414 S.C. 635, 653, 780 S.E.2d 263, 273 (Ct. App. 2015) (holding a bank did not violate the implied covenant of good faith and fair dealing in assigning a promissory note, where "no language in the . . . [n]ote prohibit[ed Bank] from selling or assigning" it).

Here, the language of the buyout agreement anticipates the sale of the Small Tract without specifying its price. Lineberger had the opportunity when negotiating the buyout agreement to stipulate a minimum price at which the Small Tract would be sold. Language within the buyout agreement suggests the value of the Small Tract was considered by Lineberger and his fellow members because the agreement specifies "*if* the sale of the [Small Tract] produces a net profit over [$1 million]." (Emphasis added.). The buyout agreement contemplates the sale could be more or less than $1 million, and allocates profit and risk accordingly. If sold for less than $1 million, QPV bears a greater risk of loss than Lineberger, secured by his note. Because the contract expressly states QPV could sell the Small Tract at, above, or below $1 million, we find there is no violation of the covenant of good faith. *See Adams*, 320 S.C. at 277, 465 S.E.2d at 85. Additionally, because we hold QPV did not violate the implied covenant of good faith and fair dealing and Lineberger is dissociated from QPV, the master's determination of the business judgment rule has no impact on this action.

As to Lineberger's argument that a 50% transfer cannot determine his rights, we disagree. While QPV has an ownership interest in DB2, they are separate entities. *See* S.C. Code Ann. § 33-44-201 (2006) ("[A] limited liability company is a legal entity distinct from its members."). Because DB2 is a separate entity, the transfer is a complete transfer of title, which extinguishes Lineberger's right to additional compensation from future use or sale of the Small Tract.

Lineberger also argues the master erred in holding the sale of the ROW to DB2 constituted a sale sufficient to determine his compensation. The attempted sale of

the ROW was part of the proposed transfer of the Small Tract. For the same reasons above, if QPV sells the ROW for $209,316, that sale would be sufficient to determine Lineberger's compensation because the transfer is to a separate legal entity, DB2. However, unlike the Small Tract, QPV's proposed transfer of the ROW was uncertain, set to occur only when and if York County releases the ROW.

Here, QPV and DB2 have contracted to convey the ROW contingent upon *if* QPV receives the property within two years. If the ROW is abandoned by York County more than two years later, the property interest is retained by QPV. Because QPV and DB2 are not transferring their existing rights in the ROW for value and instead are contracting to sell a potential future right, it was not a sale at closing. Therefore, Lineberger's rights under the buyout agreement cannot be sufficiently determined from the creation of this conditional contract.

## II.    Mortgage Satisfaction

Lineberger argues the master erred in ordering him to file a satisfaction of the mortgage where obligations remain outstanding. We agree.

"[A] mortgage is merely a security interest and must be based upon a note or other written evidence of an obligation . . . ." *Lever v. Lighting Galleries, Inc.*, 374 S.C. 30, 33, 647 S.E.2d 214, 216 (2007). "A mortgage is the imposition of a lien on certain property therein mentioned, given to secure a contract . . . ." *Aultman & Taylor Co. v. Rush*, 26 S.C. 517, 2 S.E. 402, 405 (1887). "Any holder . . . of a mortgage who has received full payment or satisfaction or to whom a legal tender has been made of his debts, damages, costs, and charges secured by mortgage of real estate shall . . . enter satisfaction . . . ." S.C. Code Ann. § 29-3-310 (2007).

"'Promissory note' means an instrument that evidences a promise to pay a monetary obligation." S.C. Code Ann. § 36-9-102 (Supp. 2018). Here, the promissory note secured $395,000 and upon full payment, the note should be satisfied. However, Lineberger's mortgage secured not only the note but also the contractual obligations of the buyout agreement, which included payment of 25% of the proceeds from the sale of the ROW. A mortgage is not satisfied where an outstanding obligation to that mortgage remains. *Cf.* S.C. Code Ann. § 29-3-310 (2007) (requiring "full payment or satisfaction" before mortgagee can request entry of satisfaction). When the Master ordered satisfaction, it removed the validly-created security interest without full satisfaction of QPV's obligations. *See U.S. Bank Tr. Nat. Ass'n v. Bell*, 385 S.C. 364, 379, 684 S.E.2d 199, 207 (Ct. App.

2009) ("We are without authority to alter an unambiguous contract by construction . . . ."). Lineberger's contractual right to 25% of the ROW's proceeds still exists,[1] and therefore, the master erred by ordering Lineberger to sign a satisfaction of the mortgage prior to actual satisfaction.

## III.    Suspended Interest

Lineberger argues the master erred in suspending interest accruing on the note because his refusal was in good faith. We agree.

"It is a long recognized principle in our courts that a valid tender stops the running of interest." *Ruscon Const. Co. of Fla. v. Beaufort-Jasper Water Auth.*, 259 S.C. 314, 320, 191 S.E.2d 715, 717 (1972). "Our courts have also recognized that a tender to be valid must be unconditional. 'A tender could only be in money, in the proper amount due, and without conditions annexed to its acceptance.'" *Id.* (quoting *Smith v. Keels*, 15 Rich. 318, 321, 49 S.C.L. 318, 321 (Ct. App. 1868)). "[A] condition reasonable in itself and which the debtor has a right to impose will not vitiate the tender." *Id*. (holding that interest should continue to accrue if the mortgagee refused a condition of tender based on the mortgagee's good faith belief he would surrender his right to indemnification).

When QPV made its tender, it demanded Lineberger satisfy its mortgage, but Lineberger refused because the mortgage on the Small Tract was tied to the disposition of the ROW. Here, QPV conditioned payment on Lineberger surrendering his rights under the mortgage that secures QPV's obligations. Because we hold Lineberger maintained a security interest under the mortgage, his refusal was neither arbitrary nor for a wrongful purpose. He refused in a good faith effort to preserve his rights under the mortgage. Therefore, we find 10% interest should accrue according to the buyout agreement until full tender of the note occurs.

---

[1] QPV's property interest in the ROW is not easily identifiable because it is a property right that may or may not exist—conditioned on the government abandonment of the ROW. We find this interest is most similar to a contingent remainder. "[A] contingent remainder in real estate may be the subject of mortgage and sale . . . ." *E.A. Beall Co. v. Weston*, 83 S.C. 491, 497, 65 S.E. 823, 825 (1909).

**CONCLUSION**

Accordingly, the order of the master-in-equity is

**AFFIRMED IN PART and REVERSED IN PART.**

**LOCKEMY, C.J., and SHORT and MCDONALD, JJ., concur.**